444 S.E.2d 62

**STATE of West Virginia, ex rel. S.C., Petitioner**

**v.**

**Gretchen Lewis CHAFIN, Secretary, Department of Health and Human Resources; and James Kirby, Director, Laurel Park Pressley Ridge School, Respondents.**

**No. 22090.**

Supreme Court of Appeals of West Virginia.

Submitted March 1, 1994.

Decided April 22, 1994.

Mary M. Downey, Facilities Review Panel, Juvenile Justice Committee, Charleston, for petitioner.

Darrell V. McGraw, Jr., Atty. Gen., Thomas M. Woodward, Deputy Atty. Gen., George P. Surmatis, Asst. Atty. Gen., Charleston, for respondents.

Jane Moran, Williamson, amicus curiae on behalf of S.C.

McHUGH, Justice:

In the case before this Court, the petitioner, S.C.,[1] a juvenile, seeks a writ of habeas corpus and a writ of mandamus against the respondents, Gretchen Lewis Chafin, Secretary, Department of Health and Human Resources ("DHHR") and James Kirby, Director, Laurel Park Pressley Ridge School,[2] to compel her release from Pressley Ridge and to require the DHHR to comply with *W.Va.Code*, 49–6–3(b) [1992], which allows the DHHR to maintain temporary custody of a child for no more than sixty days; *W.Va. Code*, 49–6–5(a) [1992], which requires the DHHR to file with the court the child's case plan, including the permanency plan for the child; *W.Va.Code*, 49–6–8(a) [1992], which requires the DHHR to file with the court a petition for review of the case if it has not permanently placed a child after twelve months; and, *W.Va.Code*, 49–6–8(d) [1992], which requires the DHHR to file a report with the court when a child in its custody receives more than three placements in one year. Upon consideration of the petition, all matters of record and the briefs and arguments of counsel,[3] we conclude that the writ

---

1. As is our practice in cases involving sensitive matters, we use initials to identify the parties rather than full names. *See In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991).

2. Pressley Ridge is a staff secure residential facility for status offenders located in Harrison County, West Virginia.

3. In addition to the briefs and argument of counsel, this Court considered an amicus curiae brief filed by attorney Jane Moran, who has diligently

of habeas corpus should be denied and the writ of mandamus should be granted.

## I.

S.C., now sixteen years old, has been in the temporary custody of the DHHR since August 27, 1991,[4] when it was determined that she was being sexually abused by her mother's boyfriend and by the boyfriend's son, as well as being physically and emotionally abused by her mother.[5] Subsequent medical and psychological evaluations of S.C. revealed that she had been "raped" and frequently abused drugs and alcohol.[6] Though the DHHR's mission is to serve the emotional and physical welfare of children such as S.C., it has not adequately done so in this case. *See W.Va.Code*, 49–1–1 [1981]. As this case demonstrates, the DHHR has not fulfilled its responsibility to secure for S.C. "custody, care and discipline" consistent with her best interests. *Id.; see also W.Va.Code*, 49–2–1 [1941].

On August 28, 1991, S.C. was moved from the Upshur County Emergency Shelter, where she was initially placed, to the Lewis County Emergency Shelter.[7] On November 8, 1991, S.C. was placed with her grandmother on a trial basis. This arrangement was terminated, however, when it was learned that S.C. was not attending school.[8] S.C. was then placed at the Genesis Youth Crisis Shelter, on December 10, 1991. On December 13, 1991, S.C. was returned to the Lewis County Emergency Shelter.[9]

On January 2, 1992, S.C. was admitted to Stonewall Memorial Hospital in Weston, West Virginia, following a suicide attempt by drug overdose. She was then transferred to St. Joseph's Hospital in Parkersburg, West Virginia, for follow-up evaluation and treatment. Upon being released from St. Joseph's Hospital, S.C. was placed at Monongalia County Youth Services in Morgantown, West Virginia on January 31, 1992.[10]

Following completion of treatment at Olympic Center, S.C. was returned to Monongalia County Youth Services, on March 18, 1992, and then moved again to the Wesley Youth Center in Beckley, West Virginia on May 5, 1992. When the Wesley facility was closed on March 18, 1993, S.C. was moved to a private foster home in Weston, West Virginia. On March 30, 1993, at S.C.'s request, she was placed at the Odyssey Group Home for Girls in Morgantown. On May 6, 1993, an Unusual Incident Report was filed by Sophia Bienek, Site Supervisor of the Odyssey Group Home, stating that, during S.C.'s meeting with staff, child protective services ("C.P.S.") worker Michal Harris argued with S.C. regarding her behavior. Ms. Bienek,

represented children on prior occasions before this Court.

4. Four other children, then aged 16, 10, 5 and 2, were also removed from the household by the DHHR.

5. Attorney Roger Thompson was appointed guardian ad litem to represent the interests of the infant children.

6. Various psychiatric and psychological evaluations of S.C. revealed that S.C. came from a family environment which was conducive to sexual molestation. S.C. reportedly suffers from frequent crying spells and feelings of being unloved, unwanted and hopeless. S.C.'s sexually promiscuous behavior and school failure indicates an environment of abuse and neglect. Examinations of S.C. also determined that she was at high risk for sexually transmitted diseases, pregnancy, alcohol and drug abuse, running away and delinquency.

7. While S.C. asserts that there was no reason for her removal from the Upshur County Shelter, the DHHR explains that S.C. was removed out of fear that she was going to engage in sexual relations with another juvenile at the facility.

8. It should be noted that S.C. has continued to maintain a close relationship with her grandmother. All parties agree that permanent placement with the grandmother would not be possible at this time, as the grandmother has been unable to control S.C.'s behavior.

9. Again, S.C. alleges that no reason was given for her removal from Genesis. Conversely, the DHHR asserts that S.C. was removed due to her disruptive behavior and frequent attempts to run away. The DHHR further states that placement in the Lewis County facility was to be temporary, until a suitable long-term placement could be found.

10. The DHHR explains that it temporarily placed S.C. at the Monongalia County facility until a bed became available at Olympic Center, where S.C. was to be admitted for a 45–day treatment program for drug and alcohol addiction.

who was present during the meeting, wrote in the report that Ms. Harris told S.C. that she dressed, "like a whore," that her actions were going to result in pregnancy and that she was going to end up like her mother.

On July 29, 1993, the Circuit Court of Upshur County entered an agreed order adjudging S.C. to be a "status offender," as that term is defined in *W.Va.Code*, 49–1–4 [1978].[11] The agreed order indicates that "the parties hereto are in agreement" as to this determination, that no hearing was held on the matter and that S.C. was not represented by counsel.[12] The agreed order further directs S.C. to remain in the temporary care, custody and control of the DHHR and to be moved to Pressley Ridge, where she was eventually placed, on July 30, 1993.

In a letter to guardian ad litem Roger Thompson, dated August 16, 1993, the executive director of Odyssey, Lisa Shepherd, questioned the agreed order of July 29, 1993 and the fact that S.C. received neither a delinquency hearing nor representation by an attorney. Ms. Shepherd further indicated that a treatment plan had been developed for S.C. by the staff at Odyssey, that S.C.'s behavior had improved significantly and that her behavior was indicative of sexual abuse survivors. It was Ms. Shepherd's belief that Mr. Thompson was given incorrect and fictitious information concerning S.C. and that S.C.'s case "should be reviewed for accuracy and due process."

Though the Juvenile Justice Committee subsequently telephoned Mr. Thompson regarding S.C.'s situation, Mr. Thompson did not respond to that phone call.

After the filing of the petition with this Court, S.C. was released from Pressley Ridge and, at her request, was returned to the Odyssey Group Home in Morgantown, where she presently resides.

## II.

Chapter 49 of the *West Virginia Code* provides the "legislative declaration of the State's interest, responsibilities and rights as respects any minor child under the age of eighteen years, who for some reason specified by the statute is in need of services, protection or care." *In re Willis*, 157 W.Va. 225, 238, 207 S.E.2d 129, 137 (1973); *see also In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993); *In re Betty J.W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988). Indeed, the State, in its role of *parens patriae*, "[s]tand[s] at the side of the natural parents with benign, but continuing, interest" in the care and custody of children. *Id.* Therefore, when it is determined that a child must be removed from his or her family, the State is required, by statute, to "secure for the child custody, care and discipline consistent with the child's best interests[.]" *W.Va.Code*, 49–1–1 [1981].

Chapter 49, article 6 of the *West Virginia Code* specifically sets forth the affirmative duties of both the DHHR and the circuit courts concerning children who have been abused or neglected. However, in S.C.'s case, neither the DHHR nor the Circuit Court of Upshur County fulfilled its statutory responsibilities.

## A.

■ *W.Va.Code*, 49–6–3(a) [1992] allows the circuit court to order a child into the

---

11. Actually, *W.Va.Code*, 49–1–4 [1978] defines "delinquent child" and not "status offender." A "delinquent child" is defined, in relevant part, as a child:

(1) Who commits an act which would be a crime . . . if committed by an adult, punishable by confinement in a jail or imprisonment;

. . . .

(3) Who, without just cause, habitually and continually refuses to respond to the lawful supervision by such child's parents, guardian or custodian;

(4) Who is habitually absent from school without good cause[.]

*W.Va.Code*, 49–5B–3(3) [1979] defines "status offender" as "a juvenile who has been charged with delinquency or adjudicated a delinquent for conduct which would not be a crime if committed by an adult."

12. The record reflects that S.C.'s C.P.S. worker, Michal Harris, approached the Upshur County Prosecuting Attorney's office concerning the order to have S.C. placed at Pressley Ridge. According to the DHHR's Service Documentation Log, dated August 6, 1993, the DHHR contacted guardian ad litem Roger Thompson concerning the agreed order. The log indicates that Mr. Thompson said that he usually likes to see what he is agreeing to and that he had not received a copy of the order. He was assured that his name only appeared at the end of the order, as a party to whom a copy should be mailed.

custody of the DHHR if the court finds there to be imminent danger to the child's physical well-being and there are no reasonable available alternatives to removal of the child. *W.Va.Code*, 49–6–3(b) [1992] [13] provides that, whether or not the court orders immediate transfer of custody as provided in *W.Va. Code*, 49–6–3(a) [1992], if the court finds that there exists imminent danger to the child, the court may schedule a preliminary hearing. If at the preliminary hearing the court finds there to be no alternative less drastic than removal of the child from his or her home, the court may order that the child be delivered into the temporary custody of the Department of Health and Human Resources or some other designated person for a period not exceeding sixty days. Furthermore, if, pursuant to *W.Va.Code*, 49–6–2 [1992], the court finds the child to be abused or neglected, then both the Department of Health and Human Resources and the court, no later than sixty days after the child is placed in the temporary custody of the Department of Health and Human Resources, are to proceed with the disposition of the child, in compliance with *W.Va.Code*, 49–6–5 [1992]. *W.Va.Code*, 49–6–5(a) [1992] [14] requires the

13. *W.Va.Code*, 49–6–3(b) [1992] states, in relevant part:

(b) Whether or not the court orders immediate transfer of custody as provided in subsection (a) of this section, if the facts alleged in the petition demonstrate to the court that there exists imminent danger to the child, the court may schedule a preliminary hearing giving the respondents at least five days' actual notice. If the court finds at the preliminary hearing that there are no alternatives less drastic than removal of the child and that a hearing on the petition cannot be scheduled in the interim period, the court may order that the child be delivered into the temporary custody of the state department or a responsible relative, which may include any parent, guardian, or other custodian, or another appropriate person or agency for a period not exceeding sixty days: Provided, That the court order shall state (1) that continuation in the home is contrary to the best interests of the child and state the reasons therefor; (2) whether or not the department made reasonable efforts to prevent the child's removal from his or her home; (3) whether or not the state department made a reasonable effort to prevent the placement or that the emergency situation made such efforts unreasonable or impossible; and (4) what efforts should be made by the department to facilitate the child's return home[.]

14. *W.Va.Code*, 49–6–5(a) [1992] states, in part:

Following a determination pursuant to section two [§ 49–6–2] of this article wherein the court finds a child to be abused or neglected, the department shall file with the court a copy of the child's case plan, including the permanency plan for the child. The term case plan means a written document that includes, where applicable, the requirements of the family case plan as provided for in ... [§ 49–6D–3] ... and that also includes at least the following: A description of the type of home or institution in which the child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to assure that the child receives proper care and that services are provided to the parents, child and foster parents in order to improve the conditions in the parent(s) home, facilitate return of the child to his or her own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child. The term permanency plan refers to that part of the case plan which is designed to achieve a permanent home for the child in the least restrictive setting available.... If reunification is not the permanency plan for the child, the plan must state why reunification is not appropriate and detail the alternative placement for the child to include approximate time lines for when such placement is expected to become a permanent placement. This case plan shall serve as the family case plan for parents of abused or neglected children.

*W.Va.Code*, 49–6D–3(a) [1984] provides, in relevant part:

Within the limits of funds available, the department of human services shall develop a family case plan for ... each family referred to the department for supervision and treatment following a determination by a court that a parent, guardian or custodian in such family has abused or neglected a child.... The family case plan is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening those problems. Every family case plan prepared by the department shall contain the following:

(1) A listing of specific, measurable, realistic goals to be achieved;

(2) An arrangement of goals into an order of priority;

(3) A listing of the problems that will be addressed by each goal;

(4) A specific description of how the assigned caseworker or caseworkers and the abusing parent, guardian or custodian will achieve each goal;

(5) A description of the departmental and community resources to be used in implementing the proposed actions and services;

Department of Health and Human Resources to file with the court a copy of the child's case plan, including the permanency plan for the child. *W.Va.Code,* 49–6–5(a) [1992] defines a case plan as a written document which includes, where applicable, the requirements of a family case plan, as set forth in *W.Va.Code,* 49–6D–3 [1984], as well as the additional requirements set forth in *W.Va. Code,* 49–6–5(a) [1992]. Furthermore, *W.Va. Code,* 49–6–5(a) [1992] requires the court to proceed to disposition, one of the dispositions being, if the court finds the abusing parent(s) unwilling to provide adequately for the child's needs, the court may commit the child temporarily to the custody of the Department of Health and Human Resources.

A preliminary hearing was held in the Circuit Court of Upshur County, on September 5, 1991, pursuant to a petition dated August 27, 1991, which asked that the care, custody and control of S.C. be awarded to the DHHR, based on the allegations of sexual, emotional and physical abuse. At the preliminary hearing, it was determined that there existed imminent danger to the physical well-being of S.C. and the other four children in the household. There was further found to be no reasonable, available alternatives to removal of the children, on a temporary basis, pending a full hearing on the matter.

A final hearing was originally scheduled for October 31, 1991. However, the case was continued until January 14, 1992, at the request of counsel for S.C.'s mother and the mother's boyfriend, because the boyfriend was awaiting extradition from Illinois to West Virginia. On January 14, 1992, the DHHR requested a continuance until February 13, 1992, so that psychiatric and psychological evaluations could be completed.[15] On February 13, 1992, the Circuit Court of Upshur County, *sua sponte,* continued further proceedings until June 26, 1992, and entered an additional order granting the DHHR con-

tinued custody of S.C. until appropriate foster care could be found. The circuit court further found that a reasonable effort had been made to prevent placement of S.C. and the other children out of the home, but that it was in their best interests to place them out of their home.

The proceedings were again continued, at the request of guardian ad litem Roger Thompson, until July 17, 1992, and by order entered August 6, 1992, the parental rights of S.C.'s mother were terminated. However, to date, there has been no hearing concerning permanent custody of S.C.

Though the DHHR concedes that it has had temporary custody of S.C. for a period exceeding sixty days, it argues that it has, nevertheless, complied with *W.Va.Code,* 49–6–3(b) [1992]. The DHHR asserts that, though this case has been continued numerous times, only one of those continuances was granted at its request. Citing overly burdened courts and prosecutors and a focus on the criminal aspects of this case, the DHHR defends the excessive delay as being caused by factors beyond its control. The DHHR further contends that it has attempted to act in the best interest of S.C., tendering, as proof, the order of February 13, 1992, in which it was found that the DHHR had made reasonable efforts to prevent the removal of S.C. from her home and in which the DHHR was given continued custody of S.C.

As we noted in *In re Carlita B.,* 185 W.Va. 613, 622, 408 S.E.2d 365, 374 (1991), lengthy procedural histories are a common occurrence in abuse and neglect cases. This Court recognized this problem when we stated: "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." *Id.* at syl. pt. 1.

We recognize that minor procedural delays are, at times, inevitable. However, S.C. has

---

(6) A list of the services which will be provided;

(7) Time targets for the achievement of goals or portions of goals;

(8) An assignment of tasks to the abusing or neglecting parent, guardian or custodian, to

the caseworker or caseworkers, and to other participants in the planning process; and

(9) A designation of when and how often tasks will be performed.

**15.** This was the only continuance requested by the DHHR.

lingered in the temporary custody of the DHHR for over two years. In cases such as S.C.'s, where months turn into years, "[r]egardless of who is responsible for the delay ... the child is the unfortunate victim." *W.Va. Dept. of Human Serv. v. La Rea Ann C.L.*, 175 W.Va. 330, 337 n. 8, 332 S.E.2d 632, 638 n. 8 (1985). Such lengthy delays will not be tolerated by this Court, if for no other reason, but to ensure the well-being of the child. As we stated in *Carlita B.*:

> [S]ome means of systematic review of child neglect and abuse cases must be established. Otherwise, the statutory time frames that govern their processing and the mandatory, periodic status reports that must be filed with the court are too easily overlooked. If such safeguards are rendered meaningless by a failure or inability to monitor cases, neglected and abused children may become lost in the very system designed to rescue them.

185 W.Va. at 624, 408 S.E.2d at 376.

■ The DHHR also contends that the mandatory duties delineated in *W.Va.Code*, 49–6–3(b) [1992] are duties required of the circuit court, and not of the DHHR and that, consequently, if a writ of mandamus is to be granted, it should be directed to the Circuit Court of Upshur County and not the DHHR.

If the circuit court finds a child to be abused or neglected pursuant to *W.Va.Code*, 49–6–2 [1992], then *both* the DHHR and the circuit court, no later than sixty days after the child is placed in the temporary custody of the DHHR, are to proceed with the disposition of the child, in compliance with *W.Va. Code*, 49–6–5 [1992]. Specifically, the DHHR shall file with the circuit court a copy of the child's case plan, including the permanency plan for the child. *See W.Va.Code*, 49–6–5(a) [1992]. *W.Va.Code*, 49–6–5(a) [1992] further provides that the circuit court "shall forthwith proceed to disposition giving both the petitioner and respondents an opportunity to be heard."

In this case, neither the DHHR nor the circuit court fulfilled its statutory responsibility to S.C. Though the DHHR has presented to this Court numerous documents concerning problem-solving and goal-setting for S.C., this Court has learned, upon further examination of this case, that those documents were never filed with the circuit court. Requiring the DHHR to file case plans with the circuit court was designed to check the often chaotic administration of the foster care system and to ensure that the system does not lose track of children in care. This procedural requirement further assures that the DHHR has properly prepared a case plan in individual cases. Clearly, it was the DHHR's statutory duty to file with the circuit court a case plan for S.C. Furthermore, the circuit court had the statutory duty of ensuring that a case plan had, in fact, been filed.

Though the documents to which the DHHR refers in its brief were not filed with the circuit court as required by *W.Va.Code*, 49–6–5(a) [1992], we recognize there was some attempt by the DHHR to, at least, formulate a case plan for S.C. During S.C.'s stay at Wesley Youth Center, the Wesley staff and S.C.'s C.P.S. worker, Michal Harris, prepared a Plan of Care, three Plan of Care Reviews and a Discharge Summary. These documents identify problems and define goals in the areas of physical and mental health, socialization, self-help, work and education, leisure skills, family, adult and peer relationships, faith development, discharge needs and case management. For the problems and goals stated, there is also a stated method and frequency of treatment, a desired outcome and target date, a responsible person and a summary of progress. Although the DHHR failed to file the Plan of Care Reviews with the circuit court, the documents do contain some of the statutory requirements of a case plan, which are enumerated in *W.Va.Code*, 49–6–5(a) [1992].

■ Furthermore, the other documents to which the DHHR refers in its brief and which were presented to this Court as exhibits do not comport with *W.Va.Code*, 49–6–5(a) [1992] and, therefore, do not constitute a case plan. For instance, the DHHR refers specifically to a Service Plan, dated September 3, 1991.[16] The DHHR asserts that, although

---

16. The substance of the one-page Service Plan consisted of identifying the problems of S.C. and

this document is entitled a "Service Plan," it is, in reality, a case plan, the difference being the terminology and not content.[17] We disagree. The Service Plan, prepared only days after S.C. was removed from her mother's home, describes S.C.'s situation in the most general and superficial terms. According to the briefs of both parties, S.C. was not even evaluated by a physician until September 4, 1991, thus explaining the cursory report on S.C.'s case.[18] We must conclude, therefore, that the September 3, 1991 Service Plan is not a case plan, pursuant to *W.Va.Code*, 49–6–5(a) [1992].

■ The DHHR further claims that the weekly progress reports, prepared at Olympic Center, during S.C.'s forty-five-day stay for drug and alcohol treatment, also meet the statutory requirements of a case plan. Again, we disagree. S.C.'s history of substance abuse certainly necessitated an intensive treatment program. Accordingly, the progress reports prepared at Olympic tracked S.C.'s participation in individual and group therapy and Alcoholic's Anonymous Twelve–Step Program for Young Adults. However, S.C.'s chemical dependency accounts for only one of the many issues which should have been addressed in her case plan.

In syllabus point 5 of *State ex rel. Dept. of H.S. v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987), we stated that, "[t]he purpose of the family case plan as set out in W.Va.Code, 49–6D–3(a) (1984), is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." The purpose of the child's case plan is the same as the family case plan, except that the focus of the child's case plan is on the child rather than the family unit.[19] The child's case plan is to include, where applicable, the requirements of a family case plan, as set forth in *W.Va.Code*, 49–6–5(a) [1992] and 49–6D–3(a) [1984], as well as the additional requirements articulated in *W.Va. Code*, 49–6–5(a) [1992].

The DHHR has gathered an assortment of documents and has labelled them a "case plan." While the Plan of Care Reviews from Wesley Youth Center contain some of the requirements of a case plan, the initial Service Plan of September 3, 1991 and the weekly progress reports from Olympic Center do not.

**B.**

■ *W.Va.Code*, 49–6–8(a) [1992][20] provides that if, twelve months after receipt by

the other children removed from the home in the following manner: "That [the children] are neglected and abused infant children and that they have not been and do not have proper parental care, control and guardianship" and "[l]ack of parental care caused educational and medical problems and severe emotional problems." The goals included: "To find appropriate placement for the infant children" and "[t]o assess each child's needs re: Health and Education." Finally, the tasks were determined to be: "Temporary Foster Care Placement until appropriate placement can be found," "[t]o make inquiries into [several relatives'] background[s] to see if they are fit and proper persons to care for the above children," "[m]edical checkups for [the children]," "[e]arly childhood Intervention Screening for [two of the children]," "investigative counseling for [S.C. and one of the other children]," and "[s]chool registration and attendance."

17. In its brief, the DHHR states that S.C.'s C.P.S. worker, Michal Harris, filed this Service Plan with the Circuit Court of Upshur County. However, the circuit clerk's office has no record of this document ever being filed there.

18. According to the briefs of both parties, S.C. was first examined for possible sexual abuse by Christopher A. Borchert, M.D., on September 4, 1991.

19. In this case, the DHHR was to prepare and file with the court a child's case plan in that the maternal rights of S.C.'s mother have been terminated and S.C. has no contact with her biological father.

20. The text of *W.Va.Code*, 49–6–8(a) [1992] states, in relevant part:

If, twelve months after receipt (by the state department or its authorized agent) of physical custody of a child ... the state department has not placed a child in permanent foster care or an adoptive home or placed the child with a natural parent, the state department shall file with the court a petition for review of the case. The department shall also file with the court a report detailing the efforts that have been made to place the child in a permanent home and copies of the child's case plan including the permanency plan as defined in ... [§ 49–6–5][.]

the Department of Health and Human Resources of physical custody of a child, the Department of Health and Human Resources has not placed the child in permanent foster care, in an adoptive home or with a natural parent, the Department of Health and Human Resources shall file with the court a petition for review of the case as well as a report detailing the efforts which have been made to place the child in a permanent home and copies of the child's case plan including the permanency plan. *W.Va.Code*, 49–6–8(a) [1992] further requires the circuit court to schedule a hearing [21] to review the child's case, to determine whether and under what conditions the child's commitment to the Department of Health and Human Resources shall continue, and to determine what efforts are necessary to provide the child with a permanent home. At the conclusion of the hearing the circuit court shall enter an appropriate order of disposition, in accordance with the best interests of the child. Under *W.Va.Code*, 49–6–8(a) [1992], the court shall retain continuing jurisdiction over cases reviewed under this section for so long as a child remains in temporary foster care.

The DHHR was given custody of S.C. on August 27, 1991. A Petition for Review of Custody of S.C., pursuant to *W.Va.Code*, 49–6–8 [1992], was not entered until July 29, 1993, approximately twenty-four months later. The DHHR has consistently maintained that the permanency plan for S.C. was placement with a relative, if possible, her maternal grandmother. However, the DHHR also argues that S.C.'s placement at Wesley Youth Center, in May of 1992, was an attempt at permanent placement and that, therefore, the DHHR did not fail to comply with *W.Va. Code*, 49–6–8(a) [1992] because it had perma-

nently placed S.C. within twelve months of obtaining custody of her. We find this explanation to be without merit. During the course of S.C.'s stay at Wesley, the various reports referred to above indicate that its goal was to permanently place S.C. with a relative. Furthermore, the Plan of Care Reviews prepared by Wesley staff estimate S.C.'s length of stay to be "over twelve months," and not "permanent." [22] It is, thus, reasonable to conclude that S.C.'s placement at Wesley was intended to be temporary. Therefore, both the DHHR and the circuit court failed to comply with *W.Va.Code*, 49–6–8(a) [1992].

### C.

■ *W.Va.Code*, 49–6–8(d) [1992] requires the DHHR to file a report with the circuit court in any case where any child in the temporary or permanent custody of the DHHR receives more than three placements in one year no later than thirty days after the third placement.[23] As the record indicates, S.C. has been shuffled through numerous facilities while in the DHHR's custody. Though the DHHR admits that it has failed to comply with the strict interpretation of *W.Va.Code*, 49–6–8(d) [1992], it asserts that its violation of the statute is not as egregious as S.C. would have this Court to believe.

According to the DHHR, it interpreted the language in that code section to require that a report be filed within thirty days after the third *permanent* placement. In its Petition for Review of Custody, the DHHR indicates that it attempted to permanently place S.C. three times during the twenty-four months it

---

21. The word hearing envisions the presence of all parties and their counsel in court and the actual opportunity to be heard on the issues before the court. The statutory requirement is not fulfilled by the entry of an order without such a hearing.

22. The DHHR further contradicts the documentation at Wesley when it states in its brief that, had Wesley not shut down altogether, it would be reasonable to believe that S.C. would be there today.

23. *W.Va.Code*, 49–6–8(d) [1992] provides:

> The state department shall file a report with the court in any case where any child in the temporary or permanent custody of the state receives more than three placements in one year no later than thirty days after the third placement. This report shall be provided to all parties and their counsel. Upon motion by any party, the court shall review these placements and determine what efforts are necessary to provide the child with a stable foster or temporary home: Provided, That no report shall be provided to any parent or parent's attorney whose parental rights have been terminated pursuant to this article.

has had custody of S.C.[24] The DHHR describes the other placements as temporary and necessary to retain S.C. only until suitable long-term placements could be found. The DHHR argues that to include *all* of S.C.'s placements as being within the meaning of *W.Va.Code,* 49–6–8(d) [1992] would be detrimental to the efficient administration of the child welfare system.

■ We find the language of *W.Va.Code,* 49–6–8(d) [1992] to be clear and unambiguous. That code section requires the DHHR to file with the circuit court a report regarding any child in its temporary or permanent custody who "receives more than three placements in one year no later than thirty days after the third placement." *Id.* Had the legislature intended the report to be filed only after three *permanent* placements, we believe it would have included that language in the statute. Unfortunately, in these types of cases, the word "permanent" has lost its significance. As we have previously held, " '[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syl. pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951)." Syl. pt. 3, *Echard v. Holland,* 177 W.Va. 138, 351 S.E.2d 51 (1986). According to the record in this case, S.C. was moved approximately ten times in one year. By failing to file a report with the circuit court within thirty days after the third placement, the DHHR violated *W.Va.Code,* 49–6–8(d) [1992].

## D.

■ On July 29, 1993, S.C. was adjudicated a "status offender" in the Circuit Court of Upshur County, based upon an agreed order between S.C.'s C.P.S. worker, Michal Harris,

and the Prosecuting Attorney for Upshur County, William Thurman. However, *W.Va. Code,* 49–5–1(c) [1982] states, in relevant part, that a "child shall have the right to be effectively represented by counsel at all stages of proceedings under the provisions of this article[,]" and *W.Va.Code,* 49–5–1(d) [1982] states, in relevant part, that "the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses." *W.Va.Code,* 49–5–1(c) and (d) [1982] are written in very clear terms. S.C. was not afforded an opportunity to be heard at the July 29, 1993 proceeding nor was she represented by counsel.[25] The case should not have proceeded in the absence of S.C. and her counsel. The agreed order should never have been entered.[26]

■ In that S.C. has been removed from Pressley Ridge, her petition for a writ of habeas corpus is moot and is, therefore, denied. S.C. is to remain at the Odyssey Group Home, in the temporary custody of the DHHR, pending the DHHR's proper disposition of her case.

We believe the case presently before this Court to be indicative of the many problems currently plaguing the foster care system. Previously, this Court, in the case of *Jennifer A., individually and o[n] behalf of B.A. and S.A., her infant children, v. Harry A. Burgess, Director of Social Services, West Virginia Department of Health and Human Resources, et al.,* No. 21009 (orders filed May 15, 1992 and July 16, 1993) addressed the need for comprehensive and workable child sexual abuse guidelines. To that end, we appointed a statewide advisory committee to develop such guidelines for the State of West Virginia. The stated mission of the commit-

---

**24.** In its brief to this Court, the DHHR indicates that it attempted to place S.C. in a permanent home four times. However, the Petition for Review of Custody, the document to which the DHHR refers, recounts only three attempts at permanent placement. The DHHR also states in its brief that S.C.'s placement in a private foster home in Weston, West Virginia, in March of 1993, was temporary. However, in the Petition for Review of Custody, the DHHR described that same foster home as an attempt at permanent placement.

**25.** Though the circuit court had previously appointed a guardian ad litem to represent S.C.'s interests in the abuse and neglect proceedings, there is no evidence that S.C. had counsel to represent her interests in this juvenile matter.

**26.** As we noted earlier, Ms. Harris did not even contact S.C.'s guardian ad litem about the agreed order until August 6, 1993, days after the proceeding.

tee is, in addition to developing comprehensive and workable child sexual abuse guidelines discussed in *Jennifer A.*, to investigate the possibility of creating regional teams from within the individual counties, to develop and recommend rules of procedure for handling investigation, treatment and resolution of child abuse and neglect cases and to develop and recommend workable and comprehensive guidelines for handling investigation, treatment and resolution of child sexual abuse cases.

Among the committee's goals and objectives is to minimize case-processing time and maximize effective delivery of services and to facilitate permanency planning. The committee further established its methods as identifying problems in the field; evaluating what other states and counties are doing; reviewing West Virginia law and limitations under federal rules and regulations (especially as perceived by the DHHR); identifying what other agencies and committees are doing; drafting rules, outlines and guidelines and submitting them to this Court; and recommending statutory changes.

As a result of the circumstances of S.C.'s case, we shall expand the role of the committee to include the following: to conduct a statewide inventory of all children who have been in the foster care system of this state for more than one year so as to identify barriers to obtaining permanent homes for these children and to make recommendations to this Court for eliminating or reducing those barriers. The committee is to further develop a uniform reporting format to be used by C.P.S. workers in preparing family case plans as well as children's case plans, so as to promote uniformity and clarity and to make the plans amenable to outside review; to develop procedures for both the DHHR and the circuit courts which ensure that a case plan has been properly prepared by the DHHR and filed with the circuit court in individual cases; to insure that time frames for all aspects of the case plan are complied with; and to require the case plan to be a discrete part of the record in each case.

In addition, the committee is to develop procedures by which the progress and timetables of case plans are to be monitored by both the DHHR and the circuit courts, so as to ensure the case plans are adhered to and remain appropriate in individual cases. Finally, we ask the committee to develop any additional plans and procedures which will ensure more effective and efficient permanency planning for children in the DHHR's care.

The order in *Jennifer A.*, filed on July 16, 1993, is to be returned within one year for a progress report. That date should be met. We recognize that the additional tasks required as a result of the S.C. case may necessitate more time. When this case was argued, Secretary Chafin commendably agreed to work with the Juvenile Justice Committee to correct the deficiencies which obviously existed in S.C.'s case. The involvement of the DHHR and the Juvenile Justice Committee alone may not accomplish the desired results in the absence of other necessary participants, including representatives of the judiciary. We believe that the utilization of the committee which is already in place and which includes representatives from the various entities involved in the process of handling of abuse and neglect cases, would be the most expeditious way to achieve the desired results. Insofar as these additional duties will require more time, we request a progress report by October 1, 1994.

As stated above, S.C. sought to compel her release from Laurel Park Pressley Ridge School. Because S.C. was released from Pressley Ridge to the Odyssey Group Home after this proceeding began, the writ of habeas corpus is denied. However, the relief relating to a writ of mandamus requiring compliance with *W.Va.Code*, 49-6-3(b) [1992] (allowing the DHHR to maintain temporary custody for a period not exceeding sixty days), *W.Va.Code*, 49-6-5(a) [1992] (requiring the DHHR to file with the circuit court a case plan including a permanency plan), *W.Va.Code*, 49-6-8(a) [1992] (requiring the DHHR to file with the circuit court a petition for review if it has not permanently placed the child after twelve months), and *W.Va.*

*Code,* 49–6–8(d) [1992] (requiring the DHHR to file a report with the circuit court when a child receives more than three placements in one year) will be granted.

Writ of Habeas Corpus denied; Writ of Mandamus granted.