IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

**FILED**

**March 27, 2026**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 24-466

IN RE A.E.

Appeal from the Circuit Court of Hancock County
The Honorable Ronald E. Wilson, Judge
Case No. CC-15-2022-JA-19

REVERSED IN PART AND REMANDED WITH DIRECTIONS

Submitted: January 14, 2026
Filed: March 27, 2026

John B. McCuskey, Esq.
Attorney General
Chaelyn W. Casteel, Esq.
Assistant Attorney General
Office of the Attorney General
Charleston, West Virginia
Counsel for Petitioner Department of
Human Services

Sharon N. Bogarad, Esq.
Weirton, West Virginia
Counsel for E.P.

Amy Pigg Shafer, Esq.
Shafer Law Offices
Wheeling, West Virginia
Guardian ad Litem for A.E.

P. Zachary Stewart, Esq.
Weirton, West Virginia
Counsel for J.E. & A.E.-3

JUSTICE EWING delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

2.      Absent explicit statutory authority, circuit courts may not order the West Virginia Department of Human Services to pay visitation-related expenses after permanency has been achieved in an abuse and neglect proceeding.

**EWING, Justice:**

In this appeal from a Hancock County abuse and neglect case, we are asked to address the authority of a circuit court to impose financial obligations on the West Virginia Department of Human Services ("DHS").[1] The DHS appeals the Circuit Court of Hancock County's July 22, 2024, permanency order to the extent that the court ordered the DHS to pay the costs of transporting the child, A.E.,[2] from his mother's home in Florida to the home of his psychological parents in West Virginia for visitation every summer until A.E. reaches the age of twenty-three. As discussed below, the circuit court had no authority to order the DHS to pay transportation costs for such visitation with psychological parents after permanency was achieved, let alone after A.E. turned eighteen. Therefore, to the extent the court ordered the DHS to pay transportation costs for the psychological parents' post-permanency visitation, the order must be reversed.[3]

## I. FACTUAL AND PROCEDURAL HISTORY

---

[1] Because a new Attorney General took office while this appeal was pending, his name has been substituted as counsel for DHS.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[3] The remainder of the order was not challenged on appeal.

1

A.E. is a medically fragile, special needs child.[4]  Following a two-day evidentiary hearing as to the permanent custody of A.E., on July 22, 2024, the circuit court entered an order (referred to herein as the "permanency order") granting permanent custody of A.E. to his non-abusive mother, E.P., who resides in Florida.  In the permanency order, the court found that A.E.'s paternal grandparents, J.E. and A.E.-3,[5] were "'psychological parents' [ ] entitled to visitation with" A.E.  Of relevance to the issue on appeal, the court's permanency order included the following language:

> As soon as the end of the 2024 – 25 school year, [A.E.] is to be transported back to his [paternal] grandparents' home [in West Virginia] and stay there until one week before the start of the new school year.  That is a requirement for each year thereafter until [A.E.] reaches the age of 23.  The transportation cost is to be paid by the [DHS].

---

[4] In the order appealed, the court explained:

> This child is profoundly disabled.  He is nonverbal and can only say "no" when he might be meaning "Yes."  He suffers seizures regularly.  He cannot feed, dress, or bathe himself.  He is incontinent to both bowel and bladder.  He has substantial vision issues.  He takes a lot of medications and requires special braces and equipment.  He must be turned in bed to avoid bedsores.

At the time the permanency order was entered, A.E. was sixteen years old.

[5] The underlying abuse and neglect case involved other respondents and children, not at issue in this appeal.  Throughout the proceedings, the paternal grandparents were referred to by the initials J.E. and A.E.-3, and we maintain that designation in this appeal for purposes of consistency.

The DHS appeals from the court's permanency order, challenging only the propriety of the court's requirement for the DHS to pay transportation costs for visitation after permanency for A.E. was achieved.[6]

## II. STANDARD OF REVIEW

The only issue presented in this appeal is the authority of a circuit court to order payment of certain expenses by the DHS. Since "the issue on . . . appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

## III. DISCUSSION

The DHS's only assignment of error on appeal is that the circuit court erred when it ordered the DHS to pay transportation costs for the child to visit his psychological parents after permanency was achieved. The DHS contends that the court lacked authority to impose this obligation on the DHS and that the court's order was legally unsupported

___

[6] Without objection, the DHS complied with the provisions of the permanency order requiring the DHS to pay the expenses of transporting A.E. to Florida and transitioning him into the custody of E.P. No party appeals the court's permanency decision placing A.E. in the permanent custody of E.P., the determination that J.E. and A.E.-3 are psychological parents of A.E., or the grant of visitation between A.E. and his psychological parents until A.E. reaches the age of twenty-three.

3

and arbitrary.[7]  We agree.  While the sole issue raised on appeal is narrow, it is necessary to revisit the respective roles, responsibilities, and authorities of both the DHS and circuit courts in abuse and neglect proceedings to place the disputed issue in proper context.

The State's power "to intervene to protect the person and property of an infant . . . devolves upon the State under the doctrine of [p]arens patriae."  *State ex rel.*

---

[7] The DHS also sets forth arguments based on the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") and grandparent visitation statutes, but no relief is warranted on either of those grounds.

First, under the UCCJEA, the DHS mistakenly contends that West Virginia "will lose jurisdiction" of A.E. after he has lived in Florida for six months.  This is not an accurate statement of the law.  Under the UCCJEA, a court of this State, having made a proper child custody determination, maintains exclusive, continuing jurisdiction until a specific finding is made by a court of this State to relinquish jurisdiction to a court of another state.  *See* W. Va. Code §§ 48-20-202 (2001), 48-20-203 (2001). As no custody proceeding has been initiated in Florida, the Circuit Court of Hancock County retains exclusive, continuing jurisdiction based upon its prior custody determination.

The DHS also contends that the circuit court's jurisdiction under the grandparent visitation statutes, West Virginia Code §§ 48-10-101 through -1201 (2006) ("Grandparent Visitation Act"), ends when A.E. turns eighteen.  Although J.E. and A.E.-3 are A.E.'s paternal grandparents, the court did not order visitation between the grandparents and A.E. pursuant to the Grandparent Visitation Act, but awarded visitation based on the court's determination that J.E. and A.E.-3 were "psychological parents" of A.E.  The fact that J.E. and A.E.-3 are A.E.'s grandparents does not "transform their visitation into grandparent visitation." *See In re Adoption of K.J.*, No. 23-735, 2025 WL 3162249, at *3 (W. Va. Nov. 12, 2025) (memorandum decision).  The Grandparent Visitation Act requires a court to consider thirteen factors enumerated in West Virginia Code § 48-10-502 (2001) and to determine that such "visitation would be in the best interests of the child and would not substantially interfere with the parent-child relationship."  W. Va. Code § 48-10-501 (2006).  Nothing in the record indicates that the court considered these factors or made the necessary findings required by the Grandparent Visitation Act.

4

*Miller v. Locke*, 162 W. Va. 946, 948, 253 S.E.2d 540, 542 (1979); *see also In re Jeffrey R.L.*, 190 W. Va. 24, 32–33, 435 S.E.2d 162, 170–71 (1993) ("We have recognized that the State, in its role of *parens patriae,* 'is the ultimate protector of the rights of minors[,]' and 'has a substantial interest in providing for their health, safety, and welfare, and may properly step in and do so when necessary.' *In re Betty J.W.*, 179 W. Va. 605, 608, 371 S.E.2d 326, 329 (1988)."). Over sixty years ago, this Court explained the historical evolution of the doctrine of *parens patriae*[8] from its monarchic origins to its codification in today's child welfare statutes:

> From the earliest time infants were regarded as entitled to special protection from the State. *See* 27 Am.Jur. 822, Infants, Section 101. In early English law, under the doctrine of *parens patriae*, the King was considered the parent or protector of all orphaned or dependent children within the realm. Since, in our country, the prerogatives of the crown devolved on the people of the states, the State, as a sovereign, now stands in the situation of *parens patriae*. *Jensen v. Sevy*, 103 Utah 220, 134 P.2d 1081; *Helton v. Crawley*, 241 Iowa 296, 41 N.W.2d 60. This doctrine expresses the inherent power and authority of the State to provide protection of the person and property of a person *non sui juris*. **In the execution of such doctrine the legislature is possessed of the inherent power to formulate such rules and regulations as may be necessary to provide protection for persons of immature years**. See 67 C.J.S. p. 624; *People v. Pierson*, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187.
>
> * * *

---

[8] "*Parens patriae*" is a Latin phrase meaning "parent of his or her country" and refers to "the state in its capacity as provider of protection to those unable to care for themselves." Black's Law Dictionary (12th ed. 2024).

5

> In 1915 the West Virginia Legislature, by Chapter 70 of its acts, passed a law pertaining to dependent, neglected or delinquent children. . . . Its enactment was an obvious expression of the intention of our lawmakers to join the then modern sociological trend by the codification of the doctrine of *parens patriae*. . . .
>
> Although our child welfare laws have been amended many times since 1915, the underlying principles upon which they were established have not changed. The welfare of the child is still the basic consideration.

*State ex rel. Slatton v. Boles*, 147 W. Va. 674, 678–80, 130 S.E.2d 192, 195-96 (1963) (emphasis added).

West Virginia's current child welfare laws are set forth in Chapter 49 of the West Virginia Code, known as the West Virginia Child Welfare Act (the "Child Welfare Act"). W. Va. Code § 49-1-101 (2015). The Child Welfare Act spells out the interwoven obligations of the judiciary and the executive branch to protect the best interests of children. *See State ex rel. S.C. v. Chafin*, 191 W. Va. 184, 189, 444 S.E.2d 62, 67 (1994) ("Chapter 49, article [4] of the *West Virginia Code* specifically sets forth the affirmative duties of both the [DHS] and the circuit courts concerning children who have been abused or neglected."). As a result, this Court has acknowledged that "[t]his *parens patriae* interest rests with both the judicial and the executive branches." *In re D.H.*, 252 W. Va. 290, 922 S.E.2d 290, 298 (2024).

"[T]he legislature has made [the DHS][9] the State's representative." Syl. Pt. 4, in part, *State ex rel. Diva P. v. Kaufman*, 200 W. Va. 555, 490 S.E.2d 642 (1997). As such, the DHS has statutory authority and responsibility for the care and protection of children in the custody of the State. *See* W. Va. Code § 49-1-106 (2024), in part;[10] W. Va. Code § 49-1-208 (2024) ("Department" or "state department" as used in Chapter 49 means the DHS); *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 321 (4th Cir. 2022) ("West Virginia entrusts to its [DHS] the care of all children in the custody of the State."); *State ex rel. W. Virginia Dep't of Hum. Servs. v. Wilmoth*, No. 24-728, 2025 WL 914419, at *2 (W. Va. Mar. 25, 2025) (memorandum decision) ("To be sure, DHS has statutory authority regarding the care and custody of juveniles."). And both State and federal law contemplate

---

[9] The DHS, formerly known as the Department of Health and Human Resources or DHHR, is a department of the executive branch created under West Virginia Code § 5F-1-2 (2024).

[10] West Virginia Code § 49-1-106 provides, in relevant part:

> (a) The child welfare service of the state shall be located within and administered by the Bureau for Social Services. . . .

> (b) The Department of Human Services is designated as the state entity to cooperate with the United States Department of Health and Human Services and United States Department of Justice in extending and improving child welfare services, to comply with federal regulations, and to receive and expend federal funds for these services.

Pursuant to West Virginia Code § 5F-2-1a(b) (2024), the Bureau for Social Services is administered as part of the DHS.

the judiciary's oversight and authority to ensure that the DHS fulfills its statutory obligations. *See, e.g., In re B.C.*, 233 W. Va. 130, 137, 755 S.E.2d 664, 671 (2014) ("[I]t is the circuit court that has exclusive 'jurisdiction to entertain an abuse and neglect petition and to conduct proceedings in accordance therewith[.]' Syllabus Point 3, *State ex rel. Paul B. v. Hill*, 201 W. Va. 248, 496 S.E.2d 198 (1997)."); 45 C.F.R. § 1356.21 (2023) (requiring judicial determination that the DHS, as the title IV-E agency, is in compliance with federal requirements and makes "reasonable efforts" with regard to its duties); W. Va. Code §§ 49-4-602 (2015), 49-4-604(c) (2020), 49-4-605 (2018), 49-4-608 (2023), 49-4-610(5) (2015) (implementing federal requirement of a judicial determination that the DHS is making "reasonable efforts" throughout abuse and neglect proceedings). "To sum up, the [DHS] maintains responsibility for planning and delivering the care, the circuit courts for supervising it." *Jonathan R.*, 41 F.4th at 322.[11]

---

[11] In considering West Virginia's Child Welfare Act, the United States Court of Appeals for the Fourth Circuit explained:

> [T]he [DHS] and the courts "*both*" have their own statutory obligations in administering care. *State ex rel. S.C. v. Chafin*, 191 W.Va. 184, 444 S.E.2d 62, 70 (1994). While the courts must approve the case plan, the Department must "develop" it. W. Va. Code Ann. § 49-4-408(a). While the courts must finally accept medical and social services, the Department must "establish" them. *Id.* §§ 49-2-101; 49-4-408(c). While the courts must confirm placements, the Department must "visit," "inspect," and "certif[y]" each foster home and actually "place[ ]" children for adoption. *Id.* §§ 49-2-106; 49-2-107, 49-4-608(b). And so on.

While Chapter 49, Article 4 of the West Virginia Code grants circuit courts broad authority in abuse and neglect proceedings, including case-specific oversight over the DHS, such authority does not extend beyond courts' constitutional role and legislatively prescribed boundaries. *See generally, e.g., In re D.H.*, 252 W. Va. 290, 922 S.E.2d 290 (finding court did not violate separation of powers doctrine by ordering the DHS to join in an abuse and neglect petition filed by father because the Legislature has determined that DHS must be a part of those proceedings); *State ex rel. D.B. v. Bedell*, 246 W. Va. 570, 578–79, 874 S.E.2d 682, 690–91 (2022) (finding a circuit court does not have authority to disregard statutory requirement for an approved home study as prerequisite for application of the grandparent preference);[12] *State ex rel. P.G.-1 v. Wilson*, 247 W. Va. 235, 247, 878 S.E.2d 730, 742 (2021) ("A circuit court may disagree with the statute and rules, but it is not at liberty to ignore them."); *In re J. G.*, 240 W. Va. 194, 809 S.E.2d 453 (2018) (ruling a court erred in disregarding the procedural and substantive statutory requirements pertaining to improvement periods); *State ex rel. Paul B. v. Hill*, 201 W. Va. 248, 496 S.E.2d 198 (1997) (finding a court exceeded its jurisdiction when it created a new basis for finding abuse and neglect, not contemplated by statute). As we have previously explained:

> The procedural and substantive requirements of West Virginia Code § 49-4-601 *et seq*., the Rules of Procedure for Child Abuse and Neglect, and our extensive body of caselaw are not

*Jonathan R.*, 41 F.4th 316 at 333.

[12] In 2023, this holding was superseded by amendment to West Virginia Code § 49-4-114(a)(3) that removed the requirement that grandparents must complete or pass a home study evaluation in order to be considered for placement.

mere guidelines. The requirements contained therein are not simply window dressing for orders which substantively fail to reach the issues and detail the findings and conclusions necessary to substantiate a court's actions. The . . . limitations and standards contained therein are mandatory and may not be casually disregarded or enlarged without detailed findings demonstrating exercise of clear-cut statutory authority. Discretion granted to the circuit court within this framework is intended to allow the court to fashion appropriate measures and remedies to highly complex familial and inter-personal issues—it does not serve as a blanket of immunity for the circuit court to manage abuse and neglect cases as its whim, personal desire, or docket may fancy.

*In re J. G.*, 240 W. Va. at 204, 809 S.E.2d at 463.

Accordingly, when circuit courts in abuse and neglect cases order the DHS to act, or to refrain from acting, the court's directive must be within the scope of authority contemplated by the Legislature. Courts' case-specific oversight over the DHS is not carte blanche to impose any obligation on the DHS that suits the court's whim, personal desire, or even notions of justice or "altruistic impulses."[13] Courts simply do not have the unfettered ability to enter orders concerning involvement of the DHS in abuse and neglect cases. The authority and discretion afforded to courts in abuse and neglect cases is limited

---

[13] Recently the United States District Court for the Southern District of West Virginia expounded upon the constitutional prohibition against courts developing public policy and administering state agencies, even when motivated by "altruistic impulses" for institutional reform. *Jonathan R. v. Morrisey*, 768 F. Supp. 3d 756, 765 (S.D.W. Va. 2025).

by constitutional and statutory bounds, and courts must be able to explain the factual reasoning and legal basis for any obligation imposed upon the DHS.

With these principles in mind, we turn to the order on appeal, in which the circuit court ordered the DHS to pay the cost of transporting the medically fragile A.E. from Florida to West Virginia for visitation with his psychological parents, after permanency was achieved and until A.E. reaches the age of twenty-three. As discussed below, the court not only lacked statutory authority to impose this obligation on the DHS, but the court also erred in binding the DHS to make expenditures beyond the pendency of the abuse and neglect proceeding. Therefore, the court's permanency order must be reversed to the extent that it ordered the DHS to pay transportation costs for A.E.'s visitation with J.E. and A.E.-3.

First, neither the circuit court nor any party on appeal has offered a statutory, regulatory, or other legal basis for the ordered transportation payments. Upon our review of applicable law, we find that transportation expenses for post-permanency visitation with psychological parents do not fall within any of the statutorily authorized categories of expenditures permitted under the Child Welfare Act or any other applicable statute.[14] Even

---

[14] West Virginia Code § 49-4-108 (2024), entitled "Payment of services," establishes the framework for State payment of services in abuse and neglect cases. The 2024 version of West Virginia Code § 49-4-108, applicable when the permanency order was entered, provided, in pertinent part:

> (a) At any time **during any proceedings** brought
> pursuant to this chapter, the court may upon its own motion, or

11

upon a motion of any party, order the Department of Human Services to pay the Medicaid rates for **professional services rendered by a health care professional** to a child or other party to the proceedings. . . .

(b) At any time **during any proceeding** brought pursuant to this chapter, the court may upon its own motion, or upon a motion of any party, order the Department of Human Services to pay for **socially necessary services** rendered by an entity who has agreed to comply with § 9-2-6(21) of this code. The Department of Human Services shall set the reimbursement rates for the socially necessary services: *Provided*, That if services are not provided within 30 days, the court may order a service to be provided by a provider at a rate higher than the department established rate. The department may object and request to be heard, after which the court shall issue findings of fact and conclusions of law supporting its decision.

(Emphasis added). Under this section, courts may order the DHS to pay for services during an abuse and neglect case that fall within one of two categories: (1) "professional services rendered by a health care professional," and (2) "socially necessary services." While the Child Welfare Act does not define "professional services" or "socially necessary services," both types of services may only be ordered during an abuse neglect proceeding. Therefore, even if we were to assume that the expenses fell within one of these categories, the ordered payments are not for services rendered "during any proceeding" but, as discussed below, are for services to be rendered wholly outside of an abuse and neglect proceeding.

Another statute, which is not relevant to these proceedings, permits certain expenditures in relation to an adult respondent's improvement period. *See* W. Va. Code § 49-4-610(4)(A) (2015) (stating that courts may also require the DHS "to pay expenses associated with the services provided during [an] improvement period when the respondent has demonstrated that he or she is unable to bear the expenses"). Transportation services for visitation with psychological parents after permanency has been achieved are not authorized under West Virginia Code § 49-4-108 or West Virginia Code § 49-4-610(4)(A), and the circuit court failed to identify any other statutory basis for the ordered payments.

12

the paternal grandparents and psychological parents, J.E. and A.E.-3, concede the lack of statutory authority for the DHS payment. On appeal, J.E. and A.E.-3 argue that, in the absence of express statutory authority, the court had equitable authority to order the DHS to pay the expenses of their visitation with A.E., as a protection for caregivers in this extraordinary circumstance.[15] However, J.E. and A.E.-3's unsupported argument states no legal basis upon which a court may exceed its statutory authority in order to fashion an equitable remedy in an abuse and neglect proceeding.[16] We have previously rejected a circuit court's reasoning that a financial obligation imposed on the DHS was "fair, reasonable, and equitable" where no legal authority supported the court's order, *State ex rel. W. Virginia Dep't of Hum. Servs. v. Delligatti*, No. 24-582, 2025 WL 1580820 (W. Va.

---

[15] From the discussion in the circuit court's permanency order, it appears that the requirement for the DHS to pay the cost of transportation for visitation was intended, at least in part, as a conciliatory measure for the benefit of the psychological parents who lost permanent custody of A.E. We are not unsympathetic with J.E. and A.E.-3's plight; however, "it is not the adult's benefit about which the courts are concerned. It is the benefit of the child that is vital." *Honaker v. Burnside*, 182 W. Va. 448, 452, 388 S.E.2d 322, 325 (1989) (citation omitted). To the extent that A.E.'s continued association with J.E. and A.E.-3 involved medical transportation to and from West Virginia, to be paid for by the DHS, the court was required to evaluate A.E.'s best interests rather than the interests of the psychological parents.

[16] The only law cited by J.E. and A.E.-3 in support of their proposition was *Honaker v. Burnside*, 182 W. Va. 448, 388 S.E.2d 322 (1989). Contrary to J.E. and A.E.-3's representation, *Honaker* did not rely upon or even discuss a court's "equitable authority." Rather, the opinion in *Honaker* relied upon the fact that continued association between the child and significant figures in her life was in the best interests of the child. *Honaker*, 182 W. Va. at 452, 388 S.E.2d at 325 (explaining that the child's "best interests must be the primary standard by which we determine her rights to continued contact with other significant figures in her life").

June 4, 2025) (memorandum decision), and for the same reasons, we find J.E. and A.E.-3's argument unavailing. Accordingly, due to the lack of any legal basis for the ordered transportation payments, the circuit court erred in ordering the DHS to pay these expenses.

Second, the circuit court also exceeded its authority by obligating the DHS to remain involved with A.E. well beyond the end of the court's abuse and neglect jurisdiction. Under the Child Welfare Act, "the State's interest, responsibilities and rights" only extend to a "minor child under the age of eighteen years,[17] who for some reason specified by the statute, is in need of services, protection or care." *Chafin*, 191 W. Va. at 189, 444 S.E.2d at 67 (quoting *In re Willis*, 157 W. Va. 225, 238, 207 S.E.2d 129, 137 (1973)). Specifically, in child abuse and neglect proceedings, the "interest, responsibilities and rights" of courts and the DHS extend only to children defined as abused or neglected. *See* W. Va. Code § 49-1-201 (2018)[18]; *see, e.g., In re R.M.*, 252 W. Va. 422, 923 S.E.2d 352, 363 (2025) ("[A] court must determine that a child is abused and/or neglected based upon the statutory definitions for the continuation of the abuse and neglect matter as to that child"); *State v. T.C.*, 172 W. Va. 47, 51, 303 S.E.2d 685, 690 (1983) ("[T]he state's right to intervene is predicated upon its initial showing that there has been child abuse or

---

[17] A "child" is defined for purposes of Chapter 49 as "any person under eighteen years of age." W. Va. Code § 49-1-202 (2024).

[18] The 2018 version of West Virginia Code § 49-1-201 was in effect when the permanency order was entered. The 2025 amendments made no changes to the definition of "abused child" or "neglected child."

neglect"). Accordingly, when a child turns eighteen or when the child is in a permanent placement, the child is no longer an "abused child" or "neglected child" for purposes of the Child Welfare Act, the State's interest ends,[19] and the case must be dismissed.[20]

In the present case, the circuit court erred (1) in ordering the DHS to make payments after A.E. turns eighteen, and (2) in binding the DHS to make those payments after A.E.'s permanency was achieved. As an initial matter, the court's order for DHS to pay the transportation costs until A.E. is twenty-three is wholly arbitrary, unsupported, and unenforceable as a matter of law. The court's jurisdiction over A.E.'s abuse and neglect case will terminate when he turns eighteen. *See State ex rel. W. Virginia Dep't of Health*

---

[19] Although not at issue in this case, a narrow exception exists for "transitioning adults" aged eighteen to twenty-one who were in the custody of the DHS upon reaching eighteen years and contracted with the DHS before their eighteenth birthday to continue services. *See* W. Va. Code § 49-1-202. From the record, it does not appear that A.E. was ever in the custody of DHS, has ever contracted with the DHS to continue services, or is likely to be competent to contract on his own behalf in the future.

[20] The West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings also contemplate that an abuse and neglect case is concluded and will be dismissed upon permanency being achieved. Rule 6 recognizes that "[e]ach child abuse and neglect proceeding shall be maintained on the circuit court's docket until permanent placement of the child has been achieved," and Rule 42(b) provides that "[i]f the court finds that permanent placement has been achieved, it may order the case dismissed from the docket." Accordingly, Rule 45(a) states that "[p]ermanent placement review shall be discontinued after permanent placement is consummated." Additionally, under Rule 52, both a court-appointed special advocate or "CASA" representative and a child's guardian ad litem shall remain involved and will not be relieved until permanent placement has been achieved. *See also In re C.E.*, 251 W. Va. 342, 350, 913 S.E.2d 366, 374 (2025) ("'[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home.' Syl. Pt. 5, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).").

*& Hum. Res. ex rel. Chastity D. v. Hill*, 207 W. Va. 358, 360 n.7, 532 S.E.2d 358, 360 n.7 (2000) ("[A] circuit court's jurisdiction over a child abuse and neglect proceeding . . . terminates when the child turns eighteen. In this particular case, the abuse and neglect proceeding should have been dismissed as to [the child] when she attained the age of eighteen."). Similarly, the DHS, through the Bureau of Social Services, is only authorized to provide care, support, and protective services for children under the age of eighteen. *See* W. Va. Code § 49-2-101(b) (2023) ("The Bureau for Social Services is authorized to provide care, support, and protective services for *children* [under certain conditions]." (emphasis added.)). Accordingly, after A.E. turns eighteen, the provisions in the permanency order for payment of visitation expenses by the DHS will be unenforceable.[21]

In addition to the impropriety of ordering the payments beyond A.E.'s eighteenth birthday, the circuit court had no authority to order the DHS to pay transportation costs for visitation with psychological parents after permanency was achieved. Permanency was clearly achieved for A.E. when he was placed in the permanent custody of his non-abusing mother, E.P. *See* W. Va. R. P. Child Abuse & Neglect Proc. 3(n)(2) (stating that one of the three meanings of "permanent placement" is when "[t]he child has been placed in the permanent custody of a non-abusive parent."). Permanent

---

[21] We acknowledge that, due to A.E.'s mental and physical limitations, after he turns eighteen, the management of his personal and financial affairs may be the subject of adult guardianship and/or conservatorship proceedings. However, any such proceedings will be separate and distinct from the abuse and neglect proceedings at issue in this appeal.

placement is the legally required outcome for an abuse and neglect case to be dismissed. Therefore, circuit courts do not have authority to order the DHS to pay visitation-related expenses after permanency has been achieved in an abuse and neglect proceeding. Under the facts of this case, once permanent placement was achieved, the DHS's financial responsibilities with respect to A.E. also ceased. The court had no authority under the Child Welfare Act or otherwise to order the DHS to pay the costs of transporting A.E. for visitation with his psychological parents after permanency was achieved.

Finally, we reiterate that the "best interests of the child" standard is the controlling consideration in every circuit court decision in an abuse and neglect case.[22] *See, e.g., In re L.M.*, 235 W. Va. 436, 445, 774 S.E.2d 517, 526 (2015) ("As this Court consistently has reiterated, in all cases involving children, the polar star is the best interests of the child."). Nevertheless, given the utter lack of any authority cited in the circuit court's order imposing transportation costs on the DHS, even a compelling "best interests" analysis

---

[22] While the circuit court thoroughly discussed the difficulty it faced in deciding which of two loving, caring and capable placement options was in the child's best interest, it provided no factual or legal justification for the additional ruling concerning the transportation costs at issue here. Moreover, the court failed to make any findings that it was in the medically fragile child's best interest to be transported from Florida to West Virginia every summer for visitation with the psychological parents, and that such best interest necessitated the DHS to bear the transportation expenses. Rather than focusing on A.E.'s best interests in rendering the challenged decision, it appears that the court included the transportation payment provision, in part, out of frustration with the DHS. The court stated in the permanency order that "[a]t times the [DHS] has avoided taking their proper role in this case. . . . It is time for them to play a proper role in this case." If the court believed that the DHS was not "taking their proper role" in the case, the appropriate time to address the concern would have been during the pendency of the case and not at permanency.

could not salvage the provision of the permanency order assigning post-permanency transportation expenses to the DHS. While the child's best interests are paramount, the concept can be stretched too far. Its elasticity must be constrained by constitutional, statutory, and rule authority, adequate findings, and competent evidence. The payment requirement in the permanency order on appeal was issued without any authority, findings, evidence, or best interest analysis, and must, therefore, be reversed and remanded for entry of an appropriate order.

## IV. CONCLUSION

Based on the foregoing, we reverse the portion of the Circuit Court of Hancock County's July 22, 2024, permanency order that orders the DHS to pay the transportation costs for A.E. to have visitation with his paternal grandparents and psychological parents, J.E. and A.E.-3.[23] We remand this matter for entry of an amended order consistent with this decision. The Clerk is directed to issue the mandate contemporaneously with this Opinion.

Reversed, in part, and Remanded with directions.

---

[23] The remainder of the permanency order is unaffected by this Court's ruling.

18