371 S.E.2d 326

In the Interest of BETTY J.W., Dorothy N.W., James E.W., Sandra K.W., and Cassie A.W.

No. 17482.

Supreme Court of Appeals of West Virginia.

July 1, 1988.

Teresa McCune, Williamson, for the mother, Mary Wright.

Timothy Koontz, Susan B. Perry, Williamson, for the children.

MILLER, Justice:

Mary W.[1] appeals from a final order of the Circuit Court of Mingo County which terminated her parental rights to her five minor children. She first assigns as error the legal insufficiency of the child abuse petition. She also contends the trial court erred in denying a statutory improvement period, in failing to adopt the least restrictive alternative appropriate to the circumstances, and in relying on her status as a victim of domestic violence as a basis for the termination of parental rights.

### I.

Mary W. and her husband, J.B.W.,[2] are the natural parents of five minor children,[3] the youngest of whom is now ten years old. On June 3, 1985, the West Virginia Department of Human Services (DHS) took emergency custody of the children.[4] In a petition to terminate parental rights filed on June 4, 1985, the DHS alleged that on April 30, 1985, the husband, J.B.W. sexually abused and assaulted his then seventeen-year-old daughter, B.J. The petition al-

---

1. We follow our past practice in domestic relations and juvenile cases which involve sensitive facts and do not utilize the last names of the parties. The husband is known only by his initials, J.B.W. *See, e.g., Nancy Viola R. v. Randolph W. and Grady W.,* 177 W.Va. 710, 356 S.E.2d 464 (1987); *West Virginia Dept. of Human Services v. La Rea Ann C.L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985).

2. On November 26, 1986, we rejected J.B.W.'s appeal from an order terminating his parental rights.

3. There were two older children, a daughter age twenty-one and a son age nineteen living at home at the time of these proceedings. Because of their ages, they were not involved in these proceedings. The daughter has now graduated from Alice Lloyd College in Pippa Passes, Kentucky.

4. W.Va.Code, 49-6-3(c) (1984), in pertinent part, states:

"If a child or children shall, in the presence of a child protective service worker of the department of human services, be in an emergency situation which constitutes an imminent danger to the physical well-being of the child or children, as that phrase is defined in section three [§ 49-1-3], article one of this chapter, and if such worker has probable cause to believe that the child or children will suffer additional child abuse or neglect or will be removed from the county before a petition can be filed and temporary custody can be ordered, the worker may, prior to the filing of a petition, take the child or children into his or her custody without a court order: Provided, That after taking custody of such child or children prior to the filing of a petition, the worker shall forthwith appear before a circuit judge or a juvenile referee of the county wherein custody was taken, or if no such judge or referee be available, before a circuit judge or a juvenile referee of an adjoining county, and shall immediately apply for an order ratifying the emergency custody of the child pending the filing of a petition."

leged that since the sexual assault, J.B.W. had been out of the marital home until June 1, 1985, when he again stayed overnight. The DHS also alleged that J.B.W. habitually physically abused his children and that Mary W. failed to protect the children from her husband's abuse.[5]

A hearing on the petition was held on June 10, 1985, at which all parties appeared except J.B.W., who was then a patient in St. Mary's Hospital. The court appointed a guardian ad litem for J.B.W. and a guardian ad litem for the five children. Testimony was taken, but no record was made of the proceedings. In an order entered August 1, 1985, the court denied motions for an improvement period, found no less drastic alternative than the removal of the children, ordered physical and legal custody to be placed with DHS, and scheduled a final hearing.

On September 17, 1985, at the final hearing, all parties appeared and were represented by counsel. J.B.W. and Mary W. individually requested improvement periods which the court denied. At the conclusion of the hearing, the court recited facts to be part of the final written order, which was entered on November 22, 1985. The trial court found that J.B.W. had abused his children, that Mary W. had failed to protect them, that no reasonable likelihood existed that the conditions of neglect and abuse could be substantially corrected, and that Mary W. and J.B.W. had refused and were unwilling to cooperate in the development of a plan to effectuate necessary changes. On that basis, the court concluded that there was no less drastic alternative than to terminate the parental rights of J.B.W. and Mary W.[6]

## II.

Mary W. first argues that the abuse petition filed by DHS did not contain specific factual allegations as required by W.Va. Code, 49–6–1(a) (1977).[7] In *State v. Scritchfield,* 167 W.Va. 683, 280 S.E.2d 315 (1981), we held in Syllabus Point 1:

"If the allegations of fact in a child neglect petition are sufficiently specific to inform the custodian of the infant of the basis upon which the petition is brought, and thus afford a reasonable opportunity to prepare a rebuttal, the child neglect petition is legally sufficient."

*See also State ex rel. Moore v. Munchmeyer,* 156 W.Va. 820, 197 S.E.2d 648 (1973).

■ The DHS filed a form petition in this case which recited the pertinent statutory language and contained only blank spaces for the specifics of the case. The DHS attached to the petition a summary which contained identifying information, the specific abusive conduct, and supportive services provided to the family. Mary W. does not argue that the summary fails to comply with statutory notice requirements. Consequently, we find that the petition and the attached written summary with its recitation of facts satisfies the statute.

## III.

■ Mary W. next contends that she was unlawfully denied a statutory improvement period under W.Va.Code, 49–6–2(b) (1984), before her parental rights were terminated.[8] It is useful to review the consti-

---

5. W.Va.Code, 49–1–3(a) (1984), provides: "'Abused child' means a child whose health or welfare is harmed or threatened by: (1) a parent, guardian or custodian who knowingly inflicts, attempts to inflict, or *knowingly allows another person to inflict, physical injury, or substantial mental or emotional injury, upon the child or another child in the home.*" (Emphasis added.)

6. *See* W.Va.Code, 49–6–5 (1984), for disposition of neglected or abused children.

7. W.Va.Code, 49–6–1(a) (1977), states in pertinent part: "The petition shall allege specific

conduct including time and place, how such conduct comes within the statutory definition of neglect or abuse with references thereto, any supportive services provided by the state department to remedy the alleged circumstances and the relief sought."

8. The text of W.Va.Code, 49–6–2(b) (1984), is: "In any proceeding under this article, the parents or custodians may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based.

tutional underpinnings upon which this statutory improvement period rests. In Syllabus Point 1 of *In Re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973), this Court, relying on *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), recognized that a natural parent has a constitutional right to the custody of his or her infant children:

> "In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody or his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions."

*See also State v. T.C.,* 172 W.Va. 47, 303 S.E.2d 685 (1983); *State ex rel. Miller v. Locke,* 162 W.Va. 946, 253 S.E.2d 540 (1979).

The United States Supreme Court's continued adherence to this basic constitutional principle is reflected in *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982):

> "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."

In *Santosky,* the Supreme Court held that the due process clause of the Fourteenth Amendment prohibited the termination of parental rights upon less than clear and convincing evidence. *Accord In Interest of S.C.,* 168 W.Va. 366, 284 S.E.2d 867 (1981); W.Va.Code, 49–6–2(c) (1984).

While parents enjoy an inherent right to the care and custody of their own children, the State in its recognized role of *parens patriae* is the ultimate protector of the rights of minors. The State has a substantial interest in providing for their health, safety, and welfare, and may properly step in to do so when necessary. *Stanley v. Illinois, supra.* This *parens patriae* interest in promoting the welfare of the child favors preservation, not severance, of natural family bonds, a proposition that is echoed in our child welfare statute. W.Va. Code, 49–2B–1 (1981).[9] The countervailing State interest in curtailing child abuse is also great. In cases of suspected abuse or neglect, the State has a clear interest in protecting the child and may, if necessary, separate abusive or neglectful parents from their children.

The dual nature of the State's interest is evidenced by the statute which permits a parent to move the court for an improvement period when abuse or neglect is alleged.[10] The court must allow the improvement period unless "compelling circumstances" justify a denial, as we explained in *State v. Scritchfield,* 167 W.Va. at 692–93, 280 S.E.2d at 321:

> "Clearly, the statute presumes the entitlement of a parent to an opportunity to ameliorate the conditions or circumstances upon which a child neglect or abuse proceeding is based pending final

The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof, but may require temporary custody in the state department or other agency during the improvement period. An order granting such improvement period shall require the department to prepare and submit to the court a family case plan in accordance with the provisions of section three [§ 49–6D–3], article six-D of this chapter."

**9.** W.Va.Code, 49–2B–1 (1981), provides in pertinent part:
"It is the policy of the State to assist a child and his or her family as the basic unit of society through efforts to strengthen and preserve the family unit. In the event of absence, temporary or permanent, of parents or the separation of a child from the family unit, for care or treatment purposes, it is the policy of the State to assure that a child receives care and nurturing as close as possible to society's expectations of a family's care and nurturing of its child. The State has a duty to assure that proper and appropriate care is given and maintained."

**10.** For the full text of W.Va.Code, 49–6–2(b) (1984), *see* note 8 *supra.*

adjudication, no doubt in recognition of the fundamental right of a parent to the custody of minor children until the unfitness of the parent is proven. *See, e.g., In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973). The statute permits the court to deny such a request only upon a finding of 'compelling circumstances.' " *See also In Re Thaxton,* 172 W.Va. 429, 307 S.E.2d 465 (1983).

█ It is important to observe that W.Va.Code, 49–6–2(b) (1984), allows a parental improvement period, while the child is temporarily physically removed from the alleged abusive situation, as the court "may require temporary custody in the state department or other agency during the improvement period."

This is the thrust of Mary W.'s claim. She moved for an improvement period at the June 10, 1985 preliminary hearing. The trial court found the alleged history of abuse by her husband, J.B.W., to be a compelling circumstance justifying the denial of an improvement period. At the final hearing, Mary W. renewed her motion. The trial court again denied the improvement period, stating that to return the children to the mother, who had continued contact with the father, "would put these children at great risk again."

It appears that the trial court believed that its only option in granting an initial improvement period was to return the children to Mary W. Nothing in the record indicates the trial court gave any consideration to the possibility of granting Mary W. an improvement period without custody of the children. As previously observed, W.Va.Code, 49–6–2(b) (1984), expressly permits a circuit court to grant an improvement period with temporary custody with the DHS or other appropriate agency. In *Scritchfield,* 167 W.Va. at 693, 280 S.E.2d at 321–22, we noted this provision:

"[T]he statute does not limit 'improvement period' to a period of time during which the mother and child live together. The statute specifically provides that the court may order the child into the temporary custody of the Department of [Human Services] or another agency during the improvement period."

We found in *Scritchfield* no compelling circumstances justifying the denial of such an improvement period. There the natural mother's rights had been permanently terminated, as in this case. The underlying problem with the mother was that she had suffered a mental illness which had occasioned the neglect and abuse of the children. During the course of the proceeding, she had been hospitalized at a mental health facility. At the time of the final hearing, testimony indicated she had recovered from her mental illness to the extent she would be able to care for her children. She had asked for an improvement period, but the court had denied it and we concluded this was reversible error.

The same type of custodial transfer can be made under W.Va.Code, 49–6–5(c) (1984).[11] This section empowers circuit courts at the dispositional hearing to grant an improvement period for up to one year as an alternative disposition, during which parental rights cannot be permanently terminated. During this period, the court can place the child with the parents, relatives, or appropriate agencies.[12]

---

11. W.Va.Code, 49–6–5(c) (1984), provides:

"The court may as an alternative disposition allow to the parents or custodians an improvement period not to exceed twelve months. During this period the parental rights shall not be permanently terminated and the court shall require the parent to rectify the conditions upon which the determination was based. No more than one such post-dispositional improvement period may be granted. *The court may order the child to be placed with the parents, a relative, the state department or other appropriate placement during the period.* At the end of the period the court shall hold a hearing to determine whether the conditions have been adequately improved, and at the conclusion of such hearing, shall make a further dispositional order in accordance with this section." (Emphasis added).

12. Given the ages of Mary W.'s children, we note that W.Va.Code, 49–6–5(a)(6) (1984), contains the following provision giving a child a voice in the termination decision:

"Notwithstanding any other provisions of this article, the permanent parental rights shall not be terminated if a child fourteen years of age or older or otherwise of an age of discre-

The failure to consider an improvement period for Mary W. was due in large part because the trial court found that she "knowingly allowed" the sexual abuse. This standard is derived from W.Va.Code, 49–1–3(a) (1984), which defines an abused child to include one whose parent "knowingly allows another person" to commit the abuse.[13]

We do not believe the record supports the trial court's legal conclusion that Mary W. "knowingly allow[ed]" the sexual abuse. Courts in other states with similar child abuse statutes, which contain a "knowingly allows" type provision, have focused on whether the parent in some manner condoned the abuse. Termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent. Typical is *In Interest of A.M.K.*, 723 S.W.2d 50 (Mo.App.1986), where a mother admitted knowing that her husband had sexually abused their children. The court terminated the mother's parental rights saying "there is no evidence that the appellant attempted to make a hot-line report or to have her husband charged with child abuse." 723 S.W.2d at 54.

Similarly, where the mother admitted to various people that she had observed sexual abuse and had condoned it with a statement that her daughter needed to be taught about "such things" before she started dating, the court terminated the mother's parental rights for her omission to act. *In Interest of H.W.E.*, 613 S.W.2d 71 (Tex.Civ.App.1981); *see also In Interest of Armentrout*, 207 Kan. 366, 485 P.2d 183 (1971); *Re: Biggs*, 17 Cal.App.3d 337, 94 Cal.Rptr. 519 (1971); *In Re: Van Vlack*, 81 Cal.App.2d 838, 185 P.2d 346 (1947).

We followed this view in *In the Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985), and terminated a father's parental rights for his nonaction in protecting his child.[14] There the father had asserted that he should be held blameless for his nonaction in protecting his child. In that case, a 38-day-old infant suffered life-threatening injuries including a skull fracture, other broken bones, and bruises. The father supported his wife's explanation for the infant's injuries, even though that testimony was inconsistent with the medical evidence and he had witnessed the first injury to his child.

This case is analogous to *Shapley v. Tex. Dept. of Human Resources*, 581 S.W.2d 250 (Tex.Civ.App.1979), in which the appellate court reversed the termination of a mother's parental rights where the father had physically abused their eighteen-month-old child. The mother took the child to a hospital emergency room, reported that her husband was a heavy drinker, and that he had beaten the child the night before and on one other prior occasion. The mother had delayed reporting the second occurrence until after her husband had gone to work. The Department of Human Resources temporarily removed the child from the home.

Three months later, the father again became intoxicated and abused the mother and the family's pet puppy. She filed suit for divorce. Witnesses who interviewed the mother after the first hearing on the abuse matter believed it unlikely that she would remain separate and apart from her husband and there was danger of future injury to the child by the father. The court held the evidence insufficient to terminate the mother's parental rights saying: "It was only because of the mother's love for her child that the beating was ever called to the attention of the authorities in the first place. Her delay could well have been caused by her own fear of her husband." 581 S.W.2d at 254. *See also In Interest of*

---

tion as determined by the court, objects to such termination. No adoption of a child shall take place until all proceedings for termination of parental rights under this article and appeals thereof are final."

13. For applicable text of W.Va.Code, 49–1–3(a) (1984), *See* note 5, *supra*.

14. The current definition of "abused child," found in W.Va.Code, 49–1–3, *see* note 4, *supra*, was adopted in 1984. The former definition limited acts of omission to inadequate supervision.

*Loitra,* 81 Ill.App.3d 962, 36 Ill.Dec. 833, 401 N.E.2d 971 (1979); *In Re Adoption of P.,* 475 Pa. 197, 380 A.2d 311 (1977).

Here, the evidence shows that Mary W. did not knowingly allow any sexual abuse. Her daughter told her about the sexual assault the day after it happened. She was unable to get away from her husband that day, but the following day, while her husband was absent, she paid a neighbor to take her and the children to her parent's residence.[15] That same day she reported the abuse to DHS and requested services including a place to stay.[16] The reasons for delay in this case, as in *Shapley,* centered on an opportunity to get away from an abusive spouse.

There was also testimony that when J.B.W. had attempted to sexually abuse the daughter during the evening hours on the day of the assault, Mary W. had interceded and was beaten and threatened with a knife. Certainly, a parent charged with acts of omission, who takes reasonable steps to protect her child and who does not defend the abuser or condone the abusive conduct, does not "knowingly allow" the abuse.

The trial court also found that Mary W. failed to protect her children by failing to keep J.B.W. away and by not separating from him. Her perceived inability to break from the pattern of abuse was described by the court as classic spouse abuse: "Men who abuse their wives classically follow that pattern and the family follows that pattern. A man beats his wife, makes promises and they kiss and make up, and there is a period psychologists call 'the honeymoon'. At some point following the honeymoon there is a cycle of abuse and the cycle starts all over again." We recognized this syndrome, which we termed "battered woman's syndrome," in *State v. Steele,* 178 W.Va. 330, 359 S.E.2d 558 (1987).[17] *See also State v. Duell,* 175 W.Va. 233, 332 S.E.2d 246 (1985).

The court apparently believed that Mary W. would continue to reconcile with her husband, thereby exposing the children to further abuse by him. However, as we have previously pointed out, an improvement period without custody of the children would have enabled Mary W. to overcome this perceived problem.[18]

The court's decision also rested on the finding that Mary W. would not cooperate in the development of a plan to provide for the safety of her children, which would involve her separating from her husband. The difficulty with this conclusion is that it is not borne out in the record. Prior to the child abuse incident, the DHS had not provided any regular services to the family for

---

**15.** There was testimony in the record that Mary W. does not know how to drive an automobile.

**16.** The court found that Mary W. obtained a warrant against her husband for the April 30, 1985 abuse.

**17.** In *Steele,* we commented on one phase of the syndrome which was that often "the abused woman is unable to free herself from her situation or report the abuse to the authorities." 178 W.Va. at 336, 359 S.E.2d at 564. We quoted this language from *Smith v. State,* 247 Ga. 612, 618–19, 277 S.E.2d 678, 683 (1981): "Because there are periods of harmony, battered women tend to believe their husbands are basically loving, caring men, that they themselves are somehow responsible for their husbands' violent behavior, and that they are low in self-esteem and feel powerless." For an earlier view of this problem, when it is said that the law permitted a husband to beat his wife with a stick no larger than his thumb, *see* Stedman, *Rights of Husband to Chastise Wife,* 3 Va.L.Rev. 241 (1917). For

more current analyses, *see* N. Taub, *Adult Domestic Violence, The Law's Response,* 8 Victimology: An Int'l J. 152, 152–57 (1983); K. Waits, *The Criminal Justice System's Response to Battering: Understanding the Problem, Forging the Solutions,* 60 Wash.L.Rev. 267 (1985).

**18.** The trial court appeared to center on the week in which the husband claimed he cohabitated at the family home. This was after criminal charges had been initiated for his sexual abuse of his daughter. Mary W. claimed that she was staying with friends and family members, but did return to the home to clean it. The children had been previously removed by court order and placed in temporary custody of the DHS. Two neighbors who testified were somewhat equivocal. One said she saw the husband at the house in the early evening hours drinking coffee. She also stated that she was aware that Mary W. was not living there full time. Another neighbor saw both of them walk by her house. She also stated she was informed earlier by Mary W. not to disclose to J.B.W. where she was staying.

some two years. There was no showing that an improvement plan had been developed and had not been followed by Mary W. on the current charges.

In fact, the record indicates that Mary W. after reporting the sexual abuse incident the day after it happened to the authorities was left to fend for herself and her family. She sought refuge with relatives. There is no indication in the record that DHS acted under W.Va.Code, 49-6A-9 (1977),[19] to bring into play its family protective services to assist Mary W. and her family. We think it inappropriate and erroneous under these circumstances to deny Mary W. an improvement period.

For the foregoing reasons, the judgment of the Circuit Court of Mingo County is reversed, and this case is remanded for further proceedings not inconsistent with this opinion. These proceedings shall include granting an improvement period with an appropriate family case plan under W.Va.Code, 49-6D-3(a) (1984). The court should decide, based on the conditions then existing, whether the children may physically reside with Mary W. during the improvement period, and should ultimately determine whether or not to reunite Mary W. and her children.

Reversed and Remanded With Directions.

---

**19.** W.Va.Code, 49-6A-9 (1977), in material part, states:

"The state department shall establish or designate in every county a local child protective service to perform the functions set forth in this article.

"Except in cases involving institutional abuse or cases in which police investigation also appears appropriate, the child protective service shall be the sole public agency responsible for receiving, investigating or arranging for investigation and coordinating the investigation of all reports of child abuse or neglect. In accordance with the local plan for child protective services, it shall provide protective services to prevent further abuse or neglect of children and provide for or arrange for and coordinate and monitor the provision of those services necessary to ensure the safety of children. The local child protective service shall be organized to maximize the continuity of responsibility, care and service of individual workers for individual children and families."