**STATE OF WEST VIRGINIA**

**In re W.M.**

**FILED**

**November 13, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**No. 24-258** (Randolph County CC-42-2023-JA-53)

## MEMORANDUM DECISION

Petitioner Father J.M.[1] appeals the April 8, 2024, order of the Circuit Court of Randolph County terminating his parental rights to his child, W.M.,[2] asserting error regarding both his adjudication and the termination of his parental rights. Specifically, the petitioner contends that the abuse and neglect petition failed to allege conduct on his part constituting abuse and neglect; his stipulation did not comply with the Rules of Procedure for Child Abuse and Neglect Proceedings; he should have been afforded an improvement period; and a less restrictive alternative to terminating his parental rights should have been imposed. Upon review of the parties' oral arguments and briefs, the submitted record, and pertinent authorities, we find merit to the petitioner's contention that his stipulation was deficient. Accordingly, we vacate the circuit court's adjudicatory and dispositional orders and remand this case for further proceedings consistent with this decision. Because this appeal does not involve a substantial question of law, a memorandum decision is appropriate pursuant to the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure.

W.M. was born in July 2023, in Harrisonburg, Virginia, although the petitioner and P.T., the child's mother, resided in Randolph County.[3] At the time of the child's birth, P.T. told hospital

---

[1] The petitioner is represented by Gregory R. Tingler, Esq. Attorney General John B. McCuskey, Esq., and Assistant Attorney General Lee Niezgoda, Esq., appear on behalf of the West Virginia Department of Human Services. The guardian ad litem is Heather M. Weese, Esq.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

[2] We use initials instead of full names to protect the identity of the juvenile involved in this case. *See* W. Va. R. App. Proc 40(e).

[3] The petitioner and P.T. were not married. During the proceedings below, they became engaged.

1

staff that W.M. was her first child, but her physical appearance indicated that she had a prior Cesarean birth. Upon investigation, hospital staff discovered that P.T. had given birth to seven other children and her parental rights to those children had been terminated in West Virginia, so a referral was made to the DHS. A Child Protective Services ("CPS") worker then went to the Virginia hospital. P.T. refused to answer the CPS worker's questions about her older children and would not even acknowledge their existence. As for the petitioner, the CPS worker determined that he had no knowledge that P.T.'s parental rights had been previously terminated or that she even had older children. The petitioner indicated that he had only known P.T. for about a year.

Three days later, the DHS removed W.M. from his parents' custody at the hospital and filed a petition instituting child abuse and neglect proceedings. Regarding P.T., the petition alleged that "aggravated circumstances" existed due to the prior involuntary termination of her parental rights[4] to her seven older children and her failure to make a significant change in her circumstances.[5] As for the petitioner, the DHS alleged that

> [a] conversation was had with the father, [J.M.], who is unable to accept the information of previous terminations as truth and has remained involved with [P.T.]. Due to his lack of understanding, [Father] is unable, at this time, to be protective. He has no previous children and has no prior CPS history.
>
> . . . Respondent Father is also not accepting the situation with regard to Respondent Mother's aggravated circumstances creating an inability of the Respondent Father to be protective.

The petitioner waived his right to a preliminary hearing. Due to several continuances, his adjudicatory hearing did not occur until February 7, 2024. Prior to that hearing, the petitioner underwent a parental fitness examination that indicated "he ha[d] some areas of defici[ency] that should be addressed in parenting classes" but concluded that he had "adequate ability in understanding appropriate parenting techniques as measured on the parenting scales." At his adjudicatory hearing, the petitioner did not contest that W.M. was abused and neglected and, instead, stipulated to the following:

> [Father] stipulates that his son was abused or neglected as defined by W.Va. Code § 49-1-201 and the laws of the State of West Virginia.

---

[4] *See* W. Va. Code § 49-4-605(a)(3) (2018) (requiring DHS to file abuse and neglect petition upon birth of child when parental rights to another child have been involuntarily terminated).

[5] The petition indicated that P.T.'s parental rights to her older children were terminated due to inappropriate living conditions, medical neglect, and lack of prenatal care. There was no allegation of drug use in the prior case, and the petition filed in this case noted that P.T. tested negative on her urinalysis when she gave birth and that W.M. was healthy.

[Father] admits, as generally alleged in Paragraph 6 of the Petition, that he failed to discover that [P.T.] previously had her parental rights to other children terminated prior to the birth of [W.M.] and that she was subject to the automatic initiation of abuse and neglect proceedings concerning [W.M.] due to her having aggravated circumstances resulting from prior terminations. [Father] further stipulates [to] a failure to protect the child from exposure to a parent with aggravated circumstances; and

[Father] believes that this Stipulation is in the best interests of his son.

On March 4, 2024, the circuit court entered an adjudicatory order finding the petitioner to be an abusing and neglecting parent based upon his stipulation.[6] Thereafter, the petitioner filed a motion for a post-adjudicatory improvement period or, alternatively, a post-dispositional improvement period. The circuit court did not rule on the motion until the dispositional hearing, which was held on April 1, 2024. Following the presentation of evidence at that hearing, which included testimony from both the petitioner and P.T., the circuit court denied the petitioner's motion for an improvement period and terminated his parental rights. In the dispositional order entered on April 8, 2024, the circuit court found as follows:

As it relates to [Father], he had a good [psychological] evaluation . . . However, [Father's] position is that he didn't know anything about [P.T.'s] CPS history and she didn't tell him. He didn't believe it when the Department did tell him.

[Father] testified initially that it would be hard and that he didn't know if he could leave [P.T.], but then testified that he would only leave if the Court terminates her rights.

Once [Father] was advised that [P.T.] had seven other children to whom her rights had been terminated, one would think that he would have to question what [P.T] was telling him.

[Father] says he didn't know why she was terminated, but that he has seen her parent and she is a good parent. He does not feel that it is important to know about her history.

While [Father] says that he will leave [P.T.] if the Court terminates her parental rights, the Court should not have to determine his relationships. He should want to look into [P.T.'s]

---

[6] P.T.'s adjudicatory hearing was held on a later date. She also stipulated to the allegations of abuse and neglect against her in the petition and by order entered on March 18, 2024, was adjudicated as an abusing and neglecting parent.

3

history, determine the circumstances, weigh the information and make a decision that is consistent with his child's best interest.

His failure to do so puts everyone in a difficult situation as there is no other information or evidence presented today to convince the Court that he is sincere in his claim that he will leave [P.T.] or that he recognizes a need to protect his child.

[Father] has resisted the obvious need for himself to make a decision between his relationship with [P.T.] and his relationship with his child in the nearly nine months since the child was born. He has put that burden on this Court and [the] Court has to make the decision that is consistent with the child's best interest.

The Court cannot grant an improvement period to [Father] under the current circumstances.

The Court cannot identify what [Father's] relationship with [P.T.] will be in the future, and that leaves no reasonable likelihood that the conditions leading to abuse and neglect can be corrected in the near future.

Upon entry of the circuit court's dispositional order, the petitioner filed this appeal.[7]

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). The petitioner first contends that the circuit court erred by adjudicating him as an abusing and neglecting parent. He argues that the abuse and neglect petition failed to include specific allegations of conduct on his part constituting abuse and/or neglect and that the stipulation he entered at adjudication did not comply with Rule 26(a) of the Rules of Procedure for Child Abuse and Neglect Proceedings. Conversely, the DHS and the guardian ad litem argue that the allegations in the petition were legally sufficient and that the petitioner's stipulation satisfied the requirements of Rule 26(a). In addition, the DHS asserts that any error in the petitioner's adjudication was invited and should not be considered by this Court because the petitioner voluntarily chose to stipulate to the allegations in the petition, never contested their sufficiency, and agreed that they supported his adjudication as an abusing and neglecting parent.

Regarding the legal sufficiency of an abuse and neglect petition, this Court has held that "if the allegations of fact in a child neglect petition are sufficiently specific to inform the custodian

---

[7] P.T.'s parental rights were terminated in the same order, and she also filed an appeal with this Court. By memorandum decision entered on March 19, 2025, this Court affirmed the circuit court's order as it related to P.T. *See In re W.M.*, 2025 WL 855646 (No. 24-259 Mar. 19, 2025) (memorandum decision). The permanency plan for W.M. is adoption in his current placement.

4

of the infants of the basis upon which the petition is brought, and thus afford a reasonable opportunity to prepare a rebuttal, the child neglect petition is legally sufficient." Syl. Pt. 1, *State v. Scritchfield*, 167 W. Va. 683, 280 S.E.2d 315 (1981). As noted above, the abuse and neglect petition was filed in this case pursuant to West Virginia Code § 49-4-605 due to the prior involuntary termination of P.T.'s parental rights to her older children. The petition alleged that P.T. had not corrected the circumstances that led to the prior termination of her parental rights and that the petitioner was unable to protect W.M. because he remained involved with P.T. and was not accepting of her prior situation. While the allegations were not extensive, given these circumstances, they were legally sufficient from a notice standpoint to inform the petitioner of the basis for the petition and thereby afforded him a reasonable opportunity to respond.[8]

As for the stipulation, we find that it failed to include the information necessary to allow the circuit court to adjudicate the petitioner as an abusing and neglecting parent. While the DHS urges this Court to reject the petitioner's argument that his stipulation was deficient because he voluntarily consented to an uncontested adjudication, Rule 26(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings mandates that a stipulation "meet the purposes of these rules and controlling statute." Consequently, if a stipulation fails to include the required information (i.e., facts that would satisfy the definition of "abused child" or "neglected child" under W. Va. Code § 49-1-201), then regardless of the parent's consent, it cannot be the basis for finding the parent to be abusive and/or neglectful under W. Va. Code § 49-4-601(i). So, whether the stipulation is legally deficient because it lacks sufficient facts "supporting court involvement" under Rule 26(a) must be determined by the circuit court in assessing whether the stipulation meets the purposes of the rules and statutes governing abuse and neglect cases. *See In re I.M.K.*, 240 W. Va. 679, 688–89, 815 S.E.2d 490, 499–500 (2018) (quoting *State v. T.C.*, 172 W. Va. 47, 51-52, 303 S.E.2d 685, 690 (1983) (footnote omitted)) ("'It is apparent that the state's right to intervene is predicated upon its initial showing that there has been child abuse or neglect, which constitutes unfitness on the part of the parents to continue, either temporarily or permanently, in their custodial role. . . . [Thus] the parties cannot circumvent the threshold question, which is the issue of abuse or neglect.'").

Recently, this Court examined Rule 26(a) and concluded that "a stipulation to adjudication in an abuse and neglect case must contain *both* types of information specified" in the rule. *In re Z.S.-1*, 249 W. Va. 14, 22, 893 S.E.2d 621, 629 (2023). Accordingly, we held:

Rule 26(a) of the West Virginia Rules of Procedure for Child
Abuse and Neglect Proceedings requires a stipulated adjudication to

---

[8] We note that had the circuit court determined that the allegations in the petition failed to encompass the abuse and neglect believed to be imminent, the petition was subject to amendment pursuant to Rule 19 of the Rules of Procedure for Child Abuse and Neglect Proceedings. That rule "allow[s] the petition to be amended at any time until the final adjudicatory hearing begins, provided that an adverse party is granted sufficient time to respond to the amendment." *Id.; see also* Syl. Pt. 5, *In re Randy H.*, 220 W. Va. 122, 640 S.E.2d 185 (2006) (recognizing that if circuit court has reasonable cause to believe that additional abuse and neglect not encompassed by the allegations in the petition has occurred or is imminent, it has inherent authority to compel DHS to file an amended petition).

include both "(1) [a]greed upon facts supporting court involvement regarding the respondent['s] problems, conduct, or condition" and "(2) [a] statement of respondent's problems or deficiencies to be addressed at the final disposition."

*Id.* at 17, 893 S.E.2d at 624, syl. pt. 3.

*In re Z.S.-1* involved an eight-month-old child who arrived at a hospital emergency room with a fever and severe bruising on his forehead and cheek. The child had been in the sole care of his mother and stepfather, and his mother reported that she believed the child was having an allergic reaction to a recent antibiotic medication or food he had eaten at a restaurant the previous day. The treating physician ruled out an allergic reaction and then reported suspected abuse to the DHS. *Id.* at 18, 893 S.E.2d at 625. The DHS filed an abuse and neglect petition, and at her adjudication, the mother stipulated that the child had been injured while in her custody, but that "she did not know how the injury occurred." *Id.* at 19, 893 S.E.2d at 626. In finding the stipulation to be deficient pursuant to the first requirement of Rule 26(a), this Court observed that "Mother's stipulation acknowledged the child's injuries but does not explain how they are related to her being named as a respondent parent in the case." *Id.* at 23, 893 S.E.2d at 630. The same defect is present in this case.

Here, the petitioner stipulated that he did not know that P.T.'s parental rights to her older children had been terminated and that he understood that she was subject to the automatic initiation of an abuse and neglect petition. However, the stipulation did not relate such knowledge, or rather lack of knowledge, to the petitioner being named as an abusing and/or neglecting respondent parent. While the petitioner further stipulated to "a failure to protect the child from exposure to a parent with aggravated circumstances" there were no facts set forth in the stipulation to support this admission either as nothing in the stipulation established the element of "known" or "should have known" as to any abuse or neglect by P.T. *See* Syl. Pt. 7, *W. Va. Dep't of Health & Hum. Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 475 S.E.2d 865 (1996) ("The term 'knowingly' as used in West Virginia Code § [49-1-201 (2018)] does not require that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse has occurred."); Syl. Pt. 3, *In Int. of Betty J.W.*, 179 W. Va. 605, 371 S.E.2d 326 (1988) ("W.Va.Code, [49-1-201 (2018)], in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent."). Because the stipulation lacked a sufficient factual basis to support the petitioner's admission to abusing or neglecting W.M., it did not satisfy the first requirement of Rule 26(a).

The stipulation also failed to comply with the second Rule 26(a) requirement because it did not include a statement of the petitioner's "problems or deficiencies" to be addressed at the final disposition. In observing that the stipulation at issue in *In re Z.S.-1* also lacked such a statement, this Court reiterated that "[i]nclusion of all the *'[r]equired information'* set forth in Rule 26(a) is not optional." *Id.* at 23, 893 S.E.2d at 630 (emphasis in original).

6

In the absence of a stipulation that satisfied both requirements of Rule 26(a), the circuit court's adjudication of the petitioner as an abusing and neglecting parent was error as was the disposition that followed. As we have explained,

> [a]bsent [a] stipulated adjudication[] that complied with the requirements of Rule 26(a) or a full adjudication on the merits, there was no proper adjudication of [the child] as an abused and/or neglected child and [the parent] as . . . a[n] abusive and/or neglectful parent[], and the circuit court lacked jurisdiction to proceed to a disposition as to [the child].

*Id.* at 24, 893 S.E.2d at 631; *see also In re A.P.-1*, 241 W. Va. 688, 693, 827 S.E.2d 830, 835 (2019) ("[O]ur statutes, cases, and rules instruct that a circuit court may not terminate parental rights at a § 49-4-604 disposition hearing without first finding that the parent abused or neglected the child in question at a § 49-4-601 adjudicatory hearing."); Syl. Pt. 1, *In re T.C.,* 172 W. Va. 47, 303 S.E.2d 685 (1983) ("In a child abuse and neglect hearing, before a court can begin to make any of the dispositional alternatives. . . it must hold a hearing . . . and determine 'whether such child is abused or neglected.' Such a finding is a prerequisite to further continuation of the case." (additional citation omitted)). Therefore, we must vacate the circuit court's March 4, 2024, adjudicatory order and the April 8, 2024, disposition order and remand this case for further proceedings that comply with the procedure for abuse and neglect cases as discussed above. *See* Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 558 S.E. 2d 620 (2001) ("Where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate dispositional order.").[9]

Our resolution of the procedural failings related to the petitioner's adjudication cannot be dictated by the problems or concerns manifested during the case, which underpinned the circuit court's disposition decision. Here, because of the due process rights implicated by the two-part process under Chapter 49, the petitioner's right to a meaningful adjudication based only upon actions or omissions occurring prior to the filing of the operative petition must be protected. *See* W. Va. Code § 49-4-601(i). Accordingly, for the reasons set forth above, the circuit court's March 4, 2024, adjudicatory order is vacated as well as its April 8, 2024, disposition order but only to the extent that it applies to the petitioner.[10] This case is remanded to the circuit court for further proceedings that comply with the procedure for abuse and neglect cases as discussed herein. The Clerk of this Court is directed to issue the mandate contemporaneously with this decision.

---

[9] Having found that the adjudicatory and dispositional orders must be vacated based upon the petitioner's deficient stipulation and that remand for further proceedings is necessary, we need not address the petitioner's remaining assignments of error.

[10] As previously noted, the circuit court's April 8, 2024, disposition order also terminated P.T.'s parental rights. Our decision today has no effect upon the order as it relates to P.T.

**ISSUED:** November 13, 2025

**CONCURRED IN BY:**

Chief Justice William R. Wooton
Justice C. Haley Bunn
Justice Thomas H. Ewing

**CONCURRING, IN PART, AND DISSENTING, IN PART:**

Justice Charles S. Trump IV

**DISSENTING:**

Senior Status Justice John A. Hutchison


TRUMP, J., concurring, in part, and dissenting, in part.

I concur in this Court's decision to vacate the circuit court's adjudicatory and dispositional orders because the petitioner's adjudicatory stipulation was plainly deficient and cannot serve as a basis for his adjudication or the termination of his parental rights to his son. However, for the reasons discussed below, I respectfully dissent from the majority's finding that the DHS's petition against the petitioner was legally sufficient to initiate or sustain the case against him. I write separately also to point out what, in my opinion, are additional errors calling into question the commencement of these proceedings against the petitioner.

The record before us reveals the following about the petitioner, J.M. At the time the DHS filed the petition charging him with neglect of his child, J.M. was a first-time father who had no prior CPS history. He was not alleged to be (or ever to have been) a drug or alcohol user, and the use or abuse of drugs or alcohol was not an issue in this case. J.M. had no criminal history or history of domestic violence, and the DHS did not allege that he ever harmed W.M. in any way, mentally or physically. J.M. was employed and had a home in Randolph County, a home where his grandmother had once lived, and the petition did not allege that this home was inadequate as housing for W.M.[1] or that J.M. failed to provide for W.M.'s needs. The record does not show that these circumstances changed in any way over the course of the proceedings below.

---

[1] In fact, the record established that no one from the DHS inspected J.M.'s home, or even sought to do so, prior to removing W.M. from his custody.

The DHS's petition against J.M. was based upon his unawareness of the facts that, in a prior case, W.M.'s mother, P.T., had been adjudicated of neglecting her seven older children and her rights to them had been involuntarily terminated.[2] Those events took place before J.M. met P.T. and before they began the relationship out of which W.M. was born. The DHS acknowledged in its petition that J.M. was unaware of P.T.'s other children or her history with CPS until its CPS worker disclosed that information to him approximately nine hours after W.M.'s birth. Not only had J.M. had nothing to do with any of the facts or circumstances associated with P.T.'s prior abuse and neglect proceedings, he was not even aware of any of it until after W.M. was born.

On appeal, J.M. argues that the DHS's petition did not meet the statutory specificity requirements of West Virginia Code § 49-4-601. I agree, and thus I cannot join the majority's finding that the petition was legally sufficient. In my opinion, it was fatally flawed. West Virginia Code § 49-4-601(b) requires that a petition allege *with particularity* the conduct that brings a child within the statutory definitions of "abused child" or "neglected child."[3] The DHS's petition in the case before us failed to meet this legal requirement. It alleged only that J.M. was "unaware" of P.T.'s prior CPS involvement, that he "did not appear to acknowledge the situation," and that he "has remained involved"[4] with her. These statements are neither allegations of abuse or neglect, nor do they describe failure to protect a child or any other wrongful conduct. This Court held long ago that "[an abuse and neglect] petition which states no facts respecting the improper care or supervision of the parents and contains only conclusory statements is defective." *State v. Scritchfield*, 167 W. Va. 683, 689, 280 S.E.2d 315, 319 (1981) (citing Syl. Pt. 2, *In re Simmons Children*, 154 W. Va. 491, 177 S.E.2d 19 (1970)). The petition against J.M. in this case, so lacking in any actual allegation of abuse or neglect, cannot, in my judgment, even be the basis for an adjudicatory hearing. To permit that is to allow the erosion of the statutory and constitutional

---

[2] The allegations in that case, which took place in another county, were based on deplorable living conditions, medical neglect, and that P.T. did not receive prenatal care during her pregnancy with her seventh child.

[3] West Virginia Code § 49-1-201 defines an "abused child" as one "whose health or welfare is being harmed or threatened by [a] parent . . . who knowingly or intentionally inflicts [or] attempts to inflict . . . physical injury or mental or emotional injury upon the child or another child in the home." It defines a "neglected child" as one "whose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply [basic necessities of care]." This Court has found "the Legislature's intention to be clear and the statute's wording to be plain. In essence, the provisions of W. Va. Code § 49-1-201 seek to protect a child who is harmed or threatened with harm *from the person* inflicting such injury or *failing to meet the child's needs*. . . . [N]eglect includes conduct that harms or threatens a child's welfare *based upon the 'refusal, failure or inability' to meet the child's needs*." *In re A.L.C.M.*, 239 W. Va. 382, 390-91, 801 S.E.2d 260, 268-69 (2017) (emphasis added).

[4] By "[he] has remained involved with [P.T.]," the DHS presumably meant that the petitioner was still at the hospital attending his newborn son and the infant's mother, who was recovering from the child's cesarean birth.

safeguards that distinguish lawful state intervention from unwarranted intrusion into the parent-child relationship.

It also appears to me from the record that the procedural deficiencies in this case were not limited to the petition's insufficiency. In my opinion, the initiation of this case against the petitioner exhibits irregularities that cast doubt on the legitimacy of the State's actions from the outset.[5] First, if the DHS travelled from Randolph County into the Commonwealth of Virginia to take custody of newborn W.M. at a hospital there without first securing an order from a court of competent jurisdiction in Virginia, and the record does not bear any indication that it did so,[6] then it exceeded the bounds of its lawful authority. W.M. was born in a hospital in Harrisonburg, Virginia, and it was from there that the DHS's case workers took custody of him. Harrisonburg, Virginia, is not within the jurisdiction of the West Virginia DHS, and it did not follow the statutorily prescribed procedures to remove him from there. In child custody matters with an interstate component, the procedure for a state to take emergency custody of a child is established in the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), West Virginia Code §§ 48-20-101 – 48-20-401 (2024). *See In re Z.H.*, 245 W. Va. 456, 462, 859 S.E.2d 399, 405 (2021) (noting that "to protect the child [born in West Virginia to parents who lived in Virginia] from immediate harm, the circuit court had temporary jurisdiction pursuant to a provision of the UCCJEA to allow the [DHS] to assume emergency custody."). Specifically, pursuant to West Virginia Code § 48-20-204(a), "[a] court of this State has temporary emergency jurisdiction *if the child is present in this State* and the child has been abandoned or it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse." (emphasis added). W.M. was not present in West Virginia when the DHS took custody of him, so this statute did not support his removal from Virginia.[7]

Virginia has likewise adopted the UCCJEA. *See* Va. Code §§ 20-146.1 – 20.146.38. Virginia's temporary emergency jurisdiction statute is almost identical to ours, providing that "[a] court of this Commonwealth has temporary emergency jurisdiction if the child *is present in this*

---

[5] The issues discussed hereafter were not raised on appeal or before the circuit court.

[6] The appendix record does not reflect that the DHS made any contact with the appropriate Virginia authorities to render the West Virginia emergency custody order enforceable in Virginia. This omission allows this Court to presume that such conduct did not occur, for we have long held that "[c]ourts of record can speak only by their records, and what does not so appear does not exist in law." Syl. Pt. 3, *Hudgins v. Crowder & Freeman, Inc.*, 156 W. Va. 111, 112, 191 S.E.2d 443, 444 (1972). *See also In re A.R.P.*, No. 22-0084, 2023 WL 3969732, *2 (W. Va. June 13, 2023) (memorandum decision) (noting that "if a fact does not appear in the appendix record, it is considered nonexistent.") (citing *State v. Delorenzo*, 247 W. Va. 707, 719, 885 S.E.2d 645, 657 (2022)).

[7] Similarly, West Virginia Code § 49-4-303 does not contemplate cross-state application, as it provides that "[a]fter taking custody of the child or children prior to the filing of a petition, the [CPS] worker shall forthwith appear before a circuit judge . . . *of the county where custody was taken* and immediately apply for an order." (emphasis added). The DHS took this child from Rockingham County, Virginia.

*Commonwealth* and the child has been abandoned or if it is necessary in an emergency to protect the child because the child . . . is subjected to mistreatment or abuse or placed in reasonable apprehension of mistreatment or abuse[.]" Virginia Code § 20-146.15 (emphasis added). Because W.M. was still in the Virginia hospital at the time the DHS took custody of him, Virginia was the state that would have had temporary emergency jurisdiction of his removal, if indeed an emergency existed. Id. Thus, the DHS should have sought relief from a court of competent jurisdiction in that state to effectuate W.M.'s removal from his parents' custody.

Alternatively, the DHS could have registered its West Virginia order in Virginia pursuant to Virginia Code § 20-146.26, which provides that

> [a] child custody determination issued by a court of another state may be registered in this Commonwealth, with or without a simultaneous request for enforcement, by sending to the appropriate juvenile and domestic relations district court in this Commonwealth: (1) [a] letter or other document requesting registration; (2) [t]wo copies, including one certified copy, of the determination sought to be registered, and a statement under penalty of perjury that to the best of the knowledge and belief of the person seeking registration the order has not been modified; and (3) [e]xcept as otherwise provided in § 20-146.20, the name and address of the person seeking registration and any parent or person acting as a parent who has been awarded custody or visitation in the child custody determination sought to be registered.

Such registration would have allowed for enforcement of the West Virginia order in Virginia pursuant to Virginia Code § 20-146.27.A., which sanctions "[a] court of this Commonwealth [to] grant any relief normally available under the law of this Commonwealth to enforce a registered child custody determination made by a court of another state."[8] From the record before us, it appears that the DHS did not pursue either course of action required by the applicable statutes. Instead, the West Virginia DHS ostensibly executed a West Virginia order in a foreign jurisdiction without following the statutorily prescribed procedures of either state. Such action exceeds the bounds of the DHS's lawful authority and is a troubling departure from the fundamental principles of due process embodied in the UCCJEA.

Next, although the DHS was statutorily required to file a petition against P.T. based on her prior involuntary terminations, *see* W. Va. Code § 49-4-605(a)(3), the petition could – and, in my judgment, should – have named J.M. as a non-offending parent. Moreover, the statutory obligation to file the petition does not automatically create a corresponding duty under West Virginia Code § 49-4-303 to effect an emergency removal. Based upon the record before us, the DHS had no lawful basis to remove W.M. in this case. The record reflects that the DHS filed its "Application

---

[8] In West Virginia, these registration and enforcement provisions are found in West Virginia Code §§ 48-20-305 and 306.

for Ratification of Emergency Custody"[9] and took custody of the child on July 10, 2023, and filed its "Petition to Institute Child Abuse and Neglect Proceedings" on July 12, 2023. The application for emergency custody, therefore, was governed by West Virginia Code § 49-4-303, which authorizes the DHS to take pre-petition custody of a child without a court order only when:

> (1) In the presence of a child protective services worker a child [is] or children are in an *emergency situation* which constitutes an *imminent danger* to the physical wellbeing of the child or children, as that phrase is defined in [West Virginia Code § 49-1-201];[10] *and*

> (2) The worker has probable cause to believe that the child or children will suffer additional child abuse or neglect or will be removed from the county before a petition can be filed and temporary custody can be ordered.

Id. (emphasis added).[11] This statute demands specific factual showings, not formulaic recitations of statutory phrases. The DHS deemed W.M. to be in imminent danger because the petitioner, a first-time father with no CPS history, was unaware of the mother's prior CPS involvement and "did not appear to acknowledge the situation." That is not imminent danger as defined in Code, and it certainly does not constitute an emergency situation as contemplated by the statute.

---

[9] This document is not included in the appendix. However, the petition notes that the DHS sought emergency custody due to "the circumstances listed above."

[10] This section defines "imminent danger to the physical well-being of the child" as "an emergency situation in which the welfare or life of the child is threatened. These conditions may include . . . reasonable cause to believe that the following conditions threaten the health, life, or safety of any child in the home: nonaccidental trauma inflicted by a parent, guardian, custodian, sibling, babysitter, or other caretaker; a combination of physical and other signs indicating a pattern of abuse which may be medically diagnosed as battered child syndrome; nutritional deprivation; abandonment by the parent, guardian, or custodian; inadequate treatment of serious injury or disease; substantial emotional injury inflicted by a parent, guardian, or custodian; sale or attempted sale of the child by the parent, guardian, or custodian; the parent, guardian, or custodian's abuse of alcohol or drugs or other controlled substance as defined in § 60A-1-101 of this code, has impaired his or her parenting skills to a degree as to pose an imminent risk to a child's health or safety; or any other condition that threatens the health, life or safety of any child in the home."

[11] Even if the DHS had filed the application simultaneously with the petition, its removal was still contrary to the operative statute, which requires an "exist[ing] imminent danger to the physical well-being of the child[]" and "no reasonably available alternatives to removal of the child, including, but not limited to, the provision of medical, psychiatric, psychological or homemaking services in the child's present custody." W. Va. Code § 49-4-602(a)(1). As discussed supra, there was no existing imminent danger to W.M.

12

In my view, the record makes plain that no emergency situation existed. Within nine hours of W.M.'s birth, a DHS employee who travelled to Harrisonburg, Virginia, "observed the baby . . . to be healthy." The petition noted that W.M. was born full term, that he weighed eight pounds and ten ounces, that P.T. had received prenatal care, and that her drug screen was negative. There was no allegation that W.M. had been abused or neglected by either parent or that he was in imminent danger as those terms are defined by statute. Nevertheless, within seventy-two hours of confirming the infant's good health and meeting J.M. for the first time, the DHS, without any assessment of J.M.'s home or his capabilities, took his child into State custody.[12] The law does not sanction such speculative, preemptive intrusions into a family. Applications for emergency custody must rest on facts specifically alleged, and the State may not substitute suspicion for evidence or association for neglect.

Based upon the foregoing, I believe that the circuit court's acceptance of J.M.'s deficient stipulation was but one of many errors in this case. The others arise from the State's failure to meet the statutory requirements for taking the petitioner's child or for initiating these proceedings against him. These requirements safeguard both constitutional due process rights and jurisdictional integrity, and the State must take care to follow them. When the government proceeds upon pleadings that do not allege imminent danger or abuse or neglect with sufficient specificity, the process is defective from inception.

I join the Court's decision to vacate the orders below for the reasons stated therein, but for the reasons I have articulated here, I dissent from the majority's finding that the petition filed by the DHS was sufficient to charge the petitioner with any act of abuse or neglect. The record demonstrates that the proceedings against the petitioner were unjustified and unwarranted. The statutory safeguards governing emergency removal and the initiation of abuse and neglect proceedings are not mere formalities. *See In re A.P.-1*, 241 W. Va. 688, 695, 827 S.E.2d 830, 837 (2019) ("Our insistence on procedural integrity in abuse and neglect cases is not hollow formality. Our statutes, cases, and rules . . . 'support[] the constitutional protections afforded to parents in permanent child removal cases.'") (internal citations omitted). The procedural requirements are designed to give life to constitutional protections that restrain the State from overreaching into the most sacred of relationships. *See* Syl. Pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973) ("In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody or his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case – the interest of parents in the care, custody, and control of their children – is perhaps the oldest of fundamental liberty interests recognized by this Court."). Here, the DHS's actions represent a troubling exercise of governmental power untethered from our law and indifferent to jurisdictional limits. The State's authority in matters of child welfare is considerable, but it is not boundless. When that authority is exercised without the

---

[12] As noted above, the DHS admitted at the dispositional hearing, which was six months after the taking, that despite the condition of a different home being a factor in P.T.'s prior case, it still had made no effort whatsoever to inspect the petitioner's home in Randolph County where he and P.T. planned to live with W.M.

discipline of statutory compliance, it ceases to protect children and instead endangers them. I concur in the decision to vacate and remand, but I would remand with direction that the petition against the petitioner be dismissed.



HUTCHISON, Senior Status Justice, dissenting:


"Superior to any rights of parents to the custody of their own children . . . is the overriding consideration of the child's best interests. Thus, the natural right of parents to the custody of their children is always tempered with the courts' overriding concern for the well-being of the children involved." *Kessel v. Leavitt*, 204 W.Va. 95, 174, 511 S.E.2d 720, 799 (1998). Indeed, this Court declared one hundred years ago that "we must not lose sight of the rule that obtains in most jurisdictions at the present day, that the welfare of the child is to be regarded more than the technical legal rights of the parent." *Conner v. Harris*, 100 W. Va. 313, 317, 130 S.E.2d 281, 283 (1925) (additional quotations and citation omitted). Yet, in this case, the majority has done that very thing. It has turned a blind eye to the fundamental rule that has been decisively established in our abuse and neglect jurisprudence for more than a century: "[T]he best interests of the child trump all other considerations. It is the polar star that steers all discretion." *Brook B. v. Ray*, 230 W. Va. 355, 361-62, 738 S.E.2d 21, 27-18 (2013); *see also Green v. Campbell*, 35 W. Va. 698, 702, 14 S.E. 212, 214 (1891) ("[T]he welfare of the infant is the polar star by which the court is to be guided in the exercise of its discretion; and the court . . . is not bound by any mere legal right of parent or guardian, but is to give it due weight as a claim founded on human nature, and generally equitable and just."). I refuse to ignore this guiding principle and, therefore, I respectfully dissent from the majority's decision in this case.

As it is compelled to do, the DHS filed an abuse and neglect petition after W.M.'s birth because his mother's parental rights to her seven older children had been previously involuntarily terminated.[1] Because P.T., W.M.'s mother, refused to discuss her prior abuse and neglect case with the CPS worker and would not even acknowledge that her older children existed, DHS could do nothing but allege in the abuse and neglect petition that there had been no significant change in her circumstances. Those circumstances included: (1) subjecting her older children to a home that was in "absolutely deplorable condition" evidenced by "mold in the bathroom, garbage and mold in the bathtub and spoiled food in the bathroom sink . . . the children did not have blankets or sheets on their beds . . . some children did not even have mattresses . . . [d]rywall was missing in parts of the home, leaving holes in the wall . . . [t]he refrigerator was not working and a family of eleven shared a mini fridge for a source of food . . . [there was] spoiled food in the floor [and] sink of the home;" (2) medical neglect established by one child having "an untreated ear infection so severe that her ear drum had ruptured," another child with "a diaper rash . . . so severe she was missing an entire layer of skin making her 'horribly raw,'" and a third child with a medical condition that "mother had neglected to address" and that "without surgery . . . c[ould] lead to severe brain damage;" and (3) failing to obtain prenatal care for the infant child born during the

---

[1] West Virginia Code § 49-4-605(a)(3) (2018) requires the DHS to file an abuse and neglect petition upon the birth of a child when "the parental rights of a parent to another child have been terminated involuntarily[.]"

proceedings. That child, the last of her older children, was born less than two years before W.M. and the termination of P.T.'s parental rights to that infant and her other children occurred just fifteen months before W.M.'s birth. When confronted with this information, the petitioner refused to believe any of it was true. Because it was clear that the petitioner was "unable to accept the information of [P.T.'s] previous terminations as true," the DHS had no choice but to allege in the petition that the petitioner was "unable, at this time, to be protective" of W.M.

When the petitioner appeared for his adjudication more than six months after W.M.'s birth, he did not contest the allegations against him in the petition and claim that he could be protective of W.M. Instead, he voluntarily chose to admit that the circumstances set forth in the petition constituted abuse and neglect of W.M. and that he lacked the ability to protect his child. If these facts are not sufficient to warrant "court involvement regarding the [petitioner's], problems, conduct, or condition" as required by Rule 26(a) of the Rules of Procedure for Child Abuse and Neglect Proceedings, then I don't know what is. While the petitioner may not have "known" about P.T.'s past abuse and neglect of her other children before W.M. was born, he certainly knew when the information was given to him immediately after W.M.'s birth and he clearly demonstrated that he was not going to take any action to protect his child. By finding that the petitioner's stipulation did not satisfy the Rule 26(a) requirements under these circumstances, the majority has unabashedly elevated the "technical legal rights" of the petitioner over W.M.'s best interests.

While I acknowledge that the petitioner's stipulation did not include a statement of his "problems or deficiencies to be addressed at the final disposition," it is obvious from the record that all parties involved—especially the petitioner—knew that the only way he could remedy the abuse and neglect to which he stipulated was to end his relationship with P.T. Because the petitioner clearly knew what he had to do, the fact that the stipulation did include a statement to that effect as required by Rule 26(a) did not constitute a substantial disregard of the abuse and neglect process to require reversal and remand under syllabus point five of *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001) (requiring disposition order to be vacated when there has been a substantial disregard of the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings). Accordingly, I would have affirmed the circuit court's adjudication of the petitioner as an abusing and neglecting father based on his stipulation.

Additionally, I would have affirmed the termination of the petitioner's parental rights. While the petitioner has argued that he should have been granted an improvement period, this Court has explained that

> in order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re: Charity H.*, 215 W. Va. 208, 217, 599 S.E.2d 631, 640 (2004) (quoting *W. Va. Dept. of Health and Human Res. v. Doris S.*, 197 W. Va. 489, 498, 475 S.E.2d 865, 874 (1996)). Given the

petitioner's refusal to recognize the threat posed by P.T.'s prior abusive and neglectful conduct, which she admittedly had not remedied, and his refusal to leave the relationship, the circuit court did not err by denying the petitioner an improvement period. *See In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) (recognizing that West Virginia law affords circuit courts discretion in deciding whether to grant parent(s) an improvement period).

Likewise, the circuit court did not err in finding no reasonable likelihood that the conditions of abuse and neglect could be corrected in the near future. While the petitioner testified at the disposition hearing that he would leave P.T. should her parental rights be terminated, the circuit court concluded that his testimony was disingenuous because he had refused to recognize the need to protect his child, claiming that P.T. "was a good parent" and "he didn't know why she was terminated" and he had resisted making a decision "between his relationship with [P.T.] and his relationship with his child in the nearly nine months since the child was born." It is well established that "in the context of abuse and neglect proceedings, the circuit court is the entity charged with weighing the credibility of witnesses[.]" *In re Emily*, 208 W. Va. 325, 339, 540 S.E.2d 542, 556 (2000). As such, the circuit court's determination that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the near future and that termination of the petitioner's parental rights was necessary for the welfare of W.M. was not error. *See* W. Va. Code § 49-4-604(c)(6) (permitting termination of parental rights upon these findings).

W.M. is now more than two years old and still has no permanency in his life. Because of the majority's decision, he will have to wait even longer. While I certainly recognize that we must protect the due process rights of a parent, our law demands that we not give such technical meaning to our procedural rules that we erode the standard that has guided this Court for more than a century. It is clear to me that the majority lost sight of the polar star in this case. Accordingly, I respectfully dissent.